216 P.3d 1110 (2009)
WATER'S EDGE HOMEOWNERS ASSOCIATION, a Washington nonprofit corporation, Appellant,
v.
WATER'S EDGE ASSOCIATES, a Washington general partnership; Paul A. Nelson and "Jane Doe" Nelson, and their marital community; Larry Pruitt and "Jane Doe" Pruitt, and their marital community; Burke M. Rice and "Jane Doe" Rice, and their marital community; Salmon Creek Developers, Inc., an Oregon corporation; Key Property Services, Inc., a Washington corporation, Defendants, and
Farmers Insurance Exchange, a foreign corporation; Mid-Century Insurance Company, a foreign corporation; and Truck Insurance Exchange, a foreign corporation, Intervenors/Respondents.
No. 37415-3-II.
Court of Appeals of Washington, Division 2.
September 29, 2009.
*1113 Daniel Eli Zimberoff, Marlyn Kathryn Hawkins, Barker Martin PS, Seattle, WA, David Bradley Merchant, Merchant Horovitz LLLC, Wailuku, HI, for Appellant.
Aaron D. Goldstein, Ball Janik LLP, Portland, OR, Pamela A. Okano, Reed McClure, Seattle, WA, for Defendants.
Tyna Ek, Misty Anne Edmundson, Soha & Lang PS, Seattle, WA, for Intervenors/Respondents.
BRIDGEWATER, J.
¶ 1 The Water's Edge Homeowners Association (HOA) entered a stipulated settlement agreement for $8.75 million and a covenant not to execute on the judgment with Water's Edge Associates (Associates), the former owners of the property in question, *1114 and Key Property Services, Inc. (KPS), Associates' property manager, based on Associates' alleged failure to disclose the true condition of the property when it converted the apartments into condominiums. Associates' and KPS's insurance providers, Farmers Insurance Exchange, Mid-Century Insurance Company, and Truck Insurance Company (collectively Farmers), intervened at the subsequent reasonableness hearing, where they successfully argued that the stipulated judgment amount of $8.75 million was unreasonable. The HOA appeals this determination. The HOA also challenges the trial court's summary judgment dismissal of several of its express and implied warranty claims under the Washington Condominium Act based on failure to satisfy the applicable statute of limitations. Finally, the HOA challenges the trial court's decision to enter an order of dismissal on its claims instead of entering a final judgment. We note that Associates and KPS are not parties to this appeal because the parties agreed that the settlement would not be contingent on the trial court's reasonableness determination. Finding no error, we affirm.

FACTS
¶ 2 Water's Edge Condominiums is a complex consisting of 18 residential buildings with 138 residential units located in Clark County, Washington. Before converting Water's Edge Condominiums into condominiums, Associates developed, constructed, owned, and operated the property as the Water's Edge Apartments.
¶ 3 Associates used KPS to manage, maintain, and repair the apartments. Beginning around 1994 and ramping up in intensity from 1999 until 2003, Associates and KPS engaged in a comprehensive repair and replacement program for siding, roofs, and exterior stairways on the property. Although Associates and KPS repaired multiple buildings, they did not repair or replace all of the siding, roofs, or stairways. The record reveals that they replaced or repaired only 15 percent of the property's siding. Associates and KPS repaired only 12 or 13 roofs and repaired between 10 and 15 chimney chases.
¶ 4 Following the conversion and transfer of control to the HOA as required by chapter 64.34 RCW, the Washington Condominium Act,[1] some of the homeowners complained about systemic water intrusion and rot. The HOA hired two consultants to conduct an intrusive investigation of the buildings' exteriors. The investigation revealed pervasive rot, deterioration, and damage to siding, stairways, and roofs.
¶ 5 The HOA sued Associates and its general partners Paul Nelson, Larry Pruitt, Burke Rice, their respective wives, and general partner Salmon Creek Developers, Inc. (cumulatively Associates), and against KPS as Associates' property manager.[2] The HOA alleged breach of implied and express warranties under the Washington Condominium Act; misrepresentations in Associates' public offering statement; violation of Associates' duty to provide documentation to the HOA; breach of the implied warranty of habitability; breach of fiduciary duty; liability under RCW 64.34.344 for failure to repair common elements; breach of contract; breach of duty to repair common elements; violation of the Consumer Protection Act, chapter 19.86 RCW; violation of board of director requirements; failure to maintain financial records and conduct independent audits; and improper use of HOA funds.
¶ 6 The trial court granted Associates and KPS's joint summary judgment motion to dismiss the HOA's implied and express warranty claims under the Washington Condominium Act as barred by the applicable four-year statute of limitation. The HOA later stipulated to dismissal of its implied warranty of habitability claim. The trial court bifurcated and set a separate trial date for the HOA's claims under the Washington Condominium Act on claims that Associates violated board of director requirements, failed to maintain financial records or conduct independent audits, and improperly used HOA funds.
*1115 ¶ 7 In mid-2005, Farmers assigned unified defense counsel Tom Heinrich to represent Associates and KPS. Heinrich left his firm in June 2006. Bruce White took over as Associates' counsel when Heinrich left.
¶ 8 In mid-2006, the HOA asked Farmers if it would schedule mediation of the dispute. Farmers responded that there was a new claims representative on the file and that Farmers may not "be receptive to trying to set up mediation at all, let alone in August." 9 CP at 1636. Farmers eventually agreed to mediate in January 2007, approximately one month before the scheduled trial date.
¶ 9 The record reveals that in late August 2006, the HOA's counsel, Daniel Zimberoff, contacted Associates' in-house attorney, Bob Hughes, and provided Hughes with a ghost letter designed to spur White to better prepare the case. Zimberoff also suggested that Associates and KPS hire Rick Beal and Greg Harper because they had extensive experience as coverage counsel in construction defect cases. Zimberoff's e-mail to Hughes included the following:
Both attorneys have had substantial success squeezing every possible nickel out of insurance companies on behalf of their clients. I know of multiple instances where counsel was even able to obtain thousands of dollars paid to their client, the insured, in addition to full indemnity to the plaintiff.
You may wish to give Rick or Greg a call.
9 CP at 1650.
¶ 10 In November 2006, Farmers sent Associates and KPS a reservation of rights letter, in which Farmers agreed to continue assigned representation, but it reserved the right to deny coverage and withdraw from the defense of some or all of the claims if circumstances warrant doing so. Further, Farmers reserved the right to seek reimbursement of all defense costs if it was ultimately determined that Farmers owed no duty to defend.
¶ 11 In response, KPS hired coverage counsel Rick Beal, the person that Zimberoff had recommended, to defend its interests against Farmers. KPS met with Beal in late November 2006. Associates hired Greg Harper, also earlier recommended by Zimberoff, as coverage counsel. In November 2006, Associates and KPS filed a separate bad faith law suit against Farmers, claiming, inter alia, that Farmers failed to properly retain separate counsel for each of the insured parties and failed to adequately prepare the case for trial. According to Zimberoff, he did not know that Associates and KPS had hired Beal and Harper until January 9, 2007, when he spoke to Beal on the phone, asking whether KPS would be willing to consider a stipulated settlement "in the event Farmers was unwilling to fund an acceptable settlement amount." 9 CP at 1638.
¶ 12 White indicated that his relationship with Associates and KPS deteriorated in November 2006 and that he was unaware of Beal's and Harper's representation of his clients as coverage counsel until January 2007. White stated that his conversations with Associates and KPS became hostile and accusatory. He opined that the change in their relationship was due to Farmers' reservation of rights letter to Associates and KPS. At some point in mid-to-late December 2006, Beal and Harper informed White that they represented Associates and KPS, and KPS subsequently objected to his representation of Associates and KPS, alleging conflict of interest concerns. As a result, White withdrew, based on Beal and Harper's claims that he committed malpractice and various ethical violations.
¶ 13 Farmers assigned Steve Todd as substitute counsel for Associates and Mark Scheer as substitute counsel for KPS. Beal instructed Scheer not to enter a formal notice of appearance and substitution and withdrawal of counsel. White contends that this request to withhold the appearance and withdrawal from the court constitutes further evidence that Beal planned to set up a manufactured legal malpractice claim against him. In addition, when Todd took over representation, Beal and Zimberoff exchanged e-mails when Beal became concerned that Todd's actions seemed to validate White's representation, which "completely undermines any legal malpractice claim against [White's firm]." 8 CP at 1402. Further, Zimberoff, Beal, and Harper included any proceeds from the legal *1116 malpractice claim against White's firm as a commodity for mutual profit to Associates, KPS, and the HOA when they eventually reached their stipulated settlement.
¶ 14 The parties were unable to reach a settlement during the January 16, 2007 mediation, where the HOA sought $17.65 million. The HOA alleges that Farmers' appointed defense attorneys (Todd and Scheer) had only limited authority to negotiate to a maximum amount of $175,000. When the HOA, Associates, and KPS realized the disparity between the HOA's requested amount and the amount that Farmers was willing to settle for, they shifted their focus to a stipulated settlement with Associates and KPS providing cash contributions, although Zimberoff and Beal actually began discussing the possibility of a stipulated settlement several days before the mediation. In their first attempt to reach a stipulated settlement, the HOA asked Associates and KPS to contribute $1.75 million cash up front, which Associates and KPS declined.
¶ 15 Following the failed mediation, Zimberoff continued further negotiations with Harper and Beal about a potential stipulated settlement. The negotiations occurred in two parts. The first part, headed by Harper, involved determining what amount of up-front cash Associates and KPS would contribute. In a January 23, 2007, settlement demand, the HOA demanded that Associates and KPS contribute $500,000 up-front cash. The parties eventually agreed on $215,000 as the up-front cash contribution. This cash contribution portion took several days of negotiation.
¶ 16 The second part of the stipulated settlement negotiations involved Beal working with Associates, KPS, and the HOA to determine the stipulated judgment amount. The January 23, 2007 settlement demand reduced the HOA's initial $17.65 million demand to $14 million. Beal countered with around $6-8 million. The parties failed to reach a settlement.
¶ 17 The next day, Zimberoff, Beal, Harper, and Bo Barker met over lunch to discuss the stipulated judgment amount. Barker, a named partner at Zimberoff's firm, was included based on his experience with stipulated judgment settlements. Beal and Barker had previously negotiated stipulated judgments and assignments of rights against insurance companies. At lunch, the parties agreed on a stipulated judgment of $8.75 million.
¶ 18 The parties agreed on two additional significant conditions. First, Associates and KPS insisted that they would not condition their release of liability on a trial court's subsequent determination that the negotiated amount was reasonable. The trial court's determination of reasonableness creates presumptive damages for the bad faith claim in the other lawsuit against Farmers. Associates and KPS agreed to assign their bad faith claim against Farmers to the HOA as part of the stipulated settlement. The second condition was that Beal would testify that the ultimate stipulated amount, $8.75 million was reasonable.
¶ 19 Under the stipulated settlement, Associates and KPS would: pay up-front cash of $215,000;[3] stipulate to an $8.75 million judgment; and assign the bad faith claim against Farmers and any other claims against Farmers or White's firm to the HOA, to which Associates and KPS would provide reasonable assistance. Associates and KPS also agreed to pursue legal malpractice and Consumer Protection Act violation claims against White's firm and to allow the HOA to execute on the proceeds from such claims if necessary to pay the balance of the stipulated judgment. In return, the HOA signed a covenant not to execute on the judgment.
¶ 20 Following the stipulated settlement, the parties jointly moved the trial court for a reasonableness hearing under RCW 4.22.060. The trial court allowed Farmers to intervene and conduct limited discovery. The trial court reviewed a considerable amount of testimony, documents, and briefing, heard argument[4] from both the parties and Farmers, *1117 and then took the case under consideration for five months before issuing its ruling. The trial court found the stipulated settlement amount of $8.75 million unreasonable and found that, as an "inexact conclusion," a $400,000 stipulated settlement would have been reasonable based on White's estimates. 9 CP at 1774.
¶ 21 The HOA joined with Associates and KPS in a joint motion for entry of judgment, in which the parties asked the trial court to enter judgment against Associates and KPS, under CR 58,[5] for $8.75 million, or in the alternative, for the trial court to pick the amount it found reasonable, although the parties would not agree to that amount because they had already appealed the trial court's ruling that the $8.75 million was not reasonable. The trial court denied their motion and instead entered a final order dismissing all of the HOA's claims.
¶ 22 The HOA appeals.

ANALYSIS

I. Reasonableness
¶ 23 The HOA contends that the trial court erred by finding the stipulated judgment amount of $8.75 million unreasonable. Specifically, it contends that: (1) the trial court disregarded or misconstrued the Chaussee[6] factors to determine reasonableness; (2) the trial court impermissibly based its reasonableness determination on allegations of collusion; (3) the trial court failed to make an independent analysis, deferring instead to White's expertise; (4) the trial court incorrectly determined that White had no motive to undervalue the case; (5) the trial court's personal distaste for stipulated settlement agreements and its misunderstanding of Washington law relating to such settlements clouded the trial court's judgment; and (6) the trial court misconstrued the settlement agreement by finding that it included assignment of a legal malpractice claim.

A. Standard of Review
¶ 24 The parties disagree on the appropriate standard of review. The HOA acknowledges that we review a trial court's reasonableness determination for abuse of discretion under Werlinger v. Warner, 126 Wash.App. 342, 349, 109 P.3d 22, review denied, 155 Wash.2d 1025, 126 P.3d 820 (2005). A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or untenable reasons. Mayer v. Sto Indus., Inc., 156 Wash.2d 677, 684, 132 P.3d 115 (2006).
¶ 25 The HOA further acknowledges that a reasonableness hearing necessarily involves factual findings which we will not disturb on appeal if substantial evidence supports them. Schmidt v. Cornerstone Invs., Inc., 115 Wash.2d 148, 158, 795 P.2d 1143 (1990). Farmers asserts that these two standards alone are the correct standards of review for reasonableness hearings.
¶ 26 But the HOA tries to distinguish this case from other reasonableness hearing cases because "there are no disputed issues of fact involving the reasonableness hearing." Br. of Appellant at 13. The HOA contends that the trial judge failed to consider each of the nine relevant factors to determine reasonableness, which it claims involve questions of law, which we, in turn, review de novo, citing Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 9, 43 P.3d 4 (2002). The HOA also claims that the lack of live testimony here necessarily means that we will simply be reviewing documents, which under In re Estate of Nelson, 85 Wash.2d 602, 605-06, 537 P.2d 765 (1975), we review de novo. We disagree.
¶ 27 None of the cases that the HOA cites indicates that a de novo standard applies to our review of a reasonableness hearing. The HOA's claim that there are no factual disputes rings hollow, as the HOA argues *1118 throughout its brief that the trial court improperly accepted certain evidence and disregarded conflicting evidence, or that the trial court gave certain evidence too much weight. We review the trial court's ruling for abuse of discretion.

B. Reasonableness
¶ 28 Our Supreme Court has provided us with a road map for reviewing reasonableness determinations, instructing us to consider the nine Chaussee factors, which are:
"[T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released."
Chaussee, 60 Wash.App. at 512, 803 P.2d 1339 (quoting Glover v. Tacoma Gen. Hosp., 98 Wash.2d 708, 717, 658 P.2d 1230 (1983), overruled on other grounds by Crown Controls, Inc. v. Smiley, 110 Wash.2d 695, 756 P.2d 717, review denied, 110 Wash.2d 695, 756 P.2d 717 (1988)). No single criterion controls and all nine are not necessarily relevant in all cases. Besel v. Viking Ins. Co., 146 Wash.2d 730, 739 n. 2, 49 P.3d 887 (2002).

1. Releasing Person's Damages
¶ 29 As an initial matter, the HOA faults the trial court for failing to cite or comment on the multiple declarations, photos, and further evidence its experts provided in support of its $9,950,386 repair estimate. This assertion of error fails for at least two reasons. First, the HOA cites no authority requiring the trial court to specifically list, cite, or comment on the evidence it relied upon. Second, Washington courts have found a trial court's reasonableness determination to be valid even when the trial court fails to list any of the Chaussee factors, instead simply mentioning that the parties addressed the factors in their briefs and the trial court considered the briefs. See Martin v. Johnson, 141 Wash.App. 611, 620, 170 P.3d 1198 (2007). It is clear that the trial court here reviewed thousands of pages of the litigation record and also discussed the Chaussee factors in its ruling. This contention lacks merit.

2. Value of Potential Damages
¶ 30 The HOA alleges that the trial court erred by failing to properly weigh its damages as the releasing party. First, it claims that the trial court failed to review evidence in the record of the HOA's damages. This argument fails because the trial court clearly reviewed the HOA's alleged damages.
¶ 31 The evidence that the trial court considered included a $9,950,386 repair estimate from Wes Snowden, director of construction defect repair development at Charter Construction. Snowden stated that he based his estimate on the removal and replacement of all siding, installation of a weather-resistive barrier, installation of flashing, installation of new roofs, installation of new windows, installation of new stairways on all buildings, and "extensive reconstruction of the structures." 5 CP at 995.
¶ 32 Snowden's declaration refers to Mark Lawless's estimate that the cost of repair in the year 2000 would have been around $1 million. Lawless was an expert hired by Heinrich that provided Heinrich and White with a cost of repair estimate less the actual repairs undertaken up until 2000, using materials that were up to code when the complex was built. Snowden attempted to reconcile the discrepancy between his estimate and Lawless's estimate by stating that Lawless did not contemplate replacing all stairways or reconstructing the chimney chases. He also asserted that construction costs have increased approximately 30 percent over the six-year period and that the property owners had not been adequately maintaining the property because they did not know the extent of the construction problems.
¶ 33 The HOA provided two additional repair estimates in early December 2006, one from Toby White of Forensic Waterproofing Consultants and one from Mark Jobe of Building Enclosure Design & Inspection Corporation. Toby White opined that the repairs *1119 would cost over $10 million. Mark Jobe estimated that repairs would cost $10 million.
¶ 34 It is evident from the trial court's ruling that the trial court considered the HOA's three estimates but simply did not find them persuasive. The prevailing thread throughout each of the HOA's estimates is the idea that cost of repair was the correct measure of damage. The trial court disagreed.
¶ 35 Instead, the trial court found credible both White and Todd's arguments that the partial summary judgment motions, which the trial court granted, dismissing the HOA's warranty claims, effectively "gutted" the HOA's case. 9 CP at 1766. Washington courts ordinarily base contract damages on the injured party's expectation interest with the intent of giving the injured party the benefit of its bargain. Eastlake Constr. Co. v. Hess, 102 Wash.2d 30, 46, 686 P.2d 465 (1984). The injured party may normally recover the reasonable cost of remedying the defects in the construction "if the cost is not clearly disproportionate to the probable loss in value to the party." Panorama Vill. Homeowner's Ass'n v. Golden Rule Roofing, Inc., 102 Wash.App. 422, 427, 10 P.3d 417 (2000), review denied, 142 Wash.2d 1018, 16 P.3d 1266 (2001).
¶ 36 These rules did not apply in this case for several reasons. First, the trial court dismissed all but one of the HOA's contract warranty claims and the HOA itself agreed to dismiss the remaining warrant of habitability claim. Thus, the normal cost of repair damages under the HOA's warranty claims were unavailable. Even if the HOA was entitled to damages on these claims, under Hogland v. Klein, 49 Wash.2d 216, 220, 298 P.2d 1099 (1956), the HOA would be entitled to the lesser of cost to repair or diminution in value. The record indicates that the HOA could not prove diminution in value because every condominium owner that sold their unit made a profit.
¶ 37 Other evidence before the trial court showed that in a November 29, 2006 memorandum to Associates and KPS, White provided a description of the remaining claims for which he intended to seek summary judgment dismissal and his estimated likelihood of success for each. The remaining claims included misrepresentation and breach of duty to disclose material facts in the public offering statement, tort claims under the Condominium Act, breach of contract against KPS, and breach of fiduciary duty by KPS. White felt confident in his ability to win dismissal of the challenges to the public offering statement and felt very confident in his ability to win dismissal on the breach of contract claim against KPS because there was no written contract.
¶ 38 White stated that, even in his worst case scenario in which the trial court allowed all of the HOA's alleged repair costs, which up until that point appeared to be $3 or $4 million, the jury would know that awarding even $2 million would result in a property much more valuable than the property the individual owners purchased. He estimated that there was a less than 20 percent chance of a jury verdict in excess of $1 million. White concluded that if the parties took the case to trial, the damages would likely be in the $300,000 range, not the $3 million range. Accordingly, he advised Associates and KPS that the case had a verdict range of between $200,000 and $500,000 and he advised Farmers that there was a likely settlement value of between $250,000 and $350,000.
¶ 39 The trial court also considered the HOA's potential damages based on Beal's argument that the negotiations must have been reasonable because the HOA initially demanded over $17 million, and he was able to reduce that request by half. The trial court correctly noted, however, that Beal's argument was based on the presumption that Associates and KPS's exposure must have approximated the greater amount.
¶ 40 In weighing the weight and credibility of the evidence, the trial court noted that Beal had never actually tried a construction defect case and that his introduction to the case came late in the litigation. In contrast, White was in the case from the start and is experienced in such litigation. Accordingly, the trial court gave great weight to White's analysis, concluding that if this were an arm's length negotiation between the parties, *1120 with the parties having to spend their own money to pay damages, the settlement amount would not come close to $8.75 million and, instead, would be closer to White's exposure estimate of $500,000 in a worst case scenario. The trial court properly considered the HOA's potential damages award and did not abuse its discretion by failing to adopt the HOA's arguments that they could possibly recover more.

3. Merits of the HOA's Liability Theory and Associates and KPS's Defense Theory
¶ 41 The HOA also faults the trial court for improperly blending the second and third Chaussee factors so as to consider Associates' and KPS's defenses to its claims. Specifically, it asserts that the trial court should not have focused on the economic loss rule because the defense was not properly before the trial court. We disagree.
¶ 42 The record supports that White's firm asserted the economic loss rule as an affirmative defense in its March 3, 2006 answer to the HOA's complaint. When Todd took over as defense counsel for Associates and KPS, he wrote a letter to Harper, Pruitt, Hughes, and Nancy Kleinrok, senior general adjuster for Farmers, several days before the mediation expressing his belief that legal defenses existed as to the HOA's remaining tort claims for misrepresentation and breach of fiduciary duties, including the economic loss rule, which precluded damages.
¶ 43 Todd again asserted this defense in his brief in opposition to the reasonableness of the settlement. Todd planned to file a motion in limine to exclude the HOA's repair estimate and he believed a "strong judge" would find that the affirmative defense barred the HOA's claimed damages. 8 CP at 1569. Further, Todd had researched the judge assigned to the pending trial, and learned that the assigned judge had recently applied the economic loss rule in another case and had been affirmed on appeal.
¶ 44 Washington's economic loss rule prohibits plaintiffs from recovering purely economic damages in tort when the plaintiff's entitlement to damages is based in contract. Alejandre v. Bull, 159 Wash.2d 674, 683, 153 P.3d 864 (2007).
The key inquiry is the nature of the loss and the manner in which it occurs, i.e., are the losses economic losses, with economic losses distinguished from personal injury or injury to other property.
Alejandre, 159 Wash.2d at 684, 153 P.3d 864. But the economic loss rule does not apply when there is no contract. See Alejandre, 159 Wash.2d at 681, 153 P.3d 864 (economic loss rule holds parties to their contract remedies). Accordingly, it appears that the economic loss rule would not apply to any claim against KPS. Regardless, even if KPS had some type of implied contract with the HOA, the HOA had no evidence of what, if any, damages arose from KPS's alleged failure to repair.
¶ 45 In contrast, it appears that the economic loss rule would likely apply to the HOA's misrepresentation and fiduciary duty claims, which sound in tort. See Hudson v. Condon, 101 Wash.App. 866, 872-73, 6 P.3d 615 (2000), review denied, 143 Wash.2d 1006, 21 P.3d 290 (2001). Because the trial court had not ruled on Todd's planned motion at the time of settlement, it is possible that the trial court could have ruled either way. If it ruled that the economic loss rule applied, the HOA's provable damages would have diminished greatly because they would be precluded from any damages on the misrepresentation and fiduciary duty claims. If the trial court denied application of the rule, Todd planned to rely on impeachment evidence to discredit Charter Construction's $10 million cost of repair estimate. Lawless's testimony was that Charter Construction had a history of preparing inaccurate and inflated repair estimates on behalf of homeowners HOAs and then renegotiating the actual cost of repair after settlement. As we discussed above, even if the trial court allowed the cost of repair estimates, the HOA would be entitled to the lesser of costs of repair or diminution in value. Hogland, 49 Wash.2d at 220, 298 P.2d 1099. Again, the HOA cannot show diminution in value because it was undisputed that every condominium owner who sold their unit had made a profit.
*1121 ¶ 46 The trial court clearly weighed this evidence as both parties briefed it extensively in preparation for the reasonableness hearing. The trial court correctly opined that "[r]easonable defendants, in assessing their chances at trial, would have taken into account that the warranty and construction defect claims had been excised." 9 CP at 1768. The trial court concluded that an objectively reasonable settlement process would have placed more emphasis on the strength of Associates and KPS's case and less emphasis on the strength of the best case scenario of the HOA's case. We agree and hold that the trial court did not abuse its discretion in considering these two Chaussee factors.

4. Released Party's Relative Fault
¶ 47 The trial court ruled that this factor had no application here. The trial court noted that this factor applies when the trial court is determining the reasonableness of a settlement between one or more codefendants with a plaintiff, the effect of which is to cast liability on the nonsettling codefendant, rather than the relative fault between defendants and plaintiffs.
¶ 48 The HOA faults the trial court for this ruling because Associates and KPS were separate entities facing joint and several liability for the HOA's claims. It argues that if Associates were to prevail against the HOA's claims, it would, nevertheless, maintain breach of contract claims against KPS. But the parties settled without any contingency that the trial court find the settlement reasonable. We hold that the trial court did not abuse its discretion by determining this factor inapplicable.

5. Interests of Third Parties Not Being Released
¶ 49 The HOA asserts that the trial court misinterpreted the interests of third parties not being released. Specifically, it argues that the trial court erred by finding that Farmers was not fully involved in the case and was, therefore, at a disadvantage. The HOA contends that Farmers had "every opportunity to participate," Br. of Appellant at 29, that Farmers hired an expert and had access to all case files, that Farmers had counsel representing its interests at the mediation, citing to Tyna Ek's declaration that she was present to represent Farmers, and that they invited Farmers to participate in the settlement negotiations and offered it every opportunity to accept full coverage and take complete control over claims defense, but Farmers refused to do so, instead choosing to rely on its reservation of rights.[7]
¶ 50 The trial court ruled that Farmers was at a disadvantage from the start because the effect of the reasonableness determination is to create a presumed measure of damages in separate litigation. It can be inferred from the trial court's ruling that it believed that once Beal and Harper, both referred by Zimberoff, signed on as coverage counsel, the parties began to align in hopes of reaching a stipulated settlement. Further, the trial court found that even if the HOA's claim that White was providing information to Farmers was true, White's exclusion from the settlement negotiations further removed Farmers from any meaningful participation in the settlement.
¶ 51 Farmers counters that the HOA's statement that Farmers had full access to information and to participate in settlement negotiations is false. Farmers asserts that when it assigns defense counsel, that counsel's only client is the defendant. As evidence of this process Farmers cites to Beal's letter to assigned defense counsel Scheer that KPS did not feel comfortable with Scheer reporting defense strategy to Farmers. The HOA agrees with this principle, noting that under Tank v. State Farm Fire & Cas. Co., 105 Wash.2d 381, 388, 715 P.2d 1133 (1986), insurance appointed counsel has *1122 a duty to the insured that cannot be subordinated to the insurer's interests.
¶ 52 By the time Associates and KPS asserted that White had a conflict of interest, the parties were already aligned and ready to work toward a stipulated settlement at Farmers' expense. The HOA contends that Associates and KPS knew that the settlement discussions during the mediation would be about reaching a stipulated settlement and, thus, only coverage counsel should be present in the discussions. As further support of this alignment before the mediation, Associates and KPS did not involve Farmers in its preparation meeting the day before the mediation, where they likely discussed how a stipulated settlement worked. Furthermore, once the parties were actively pursuing the stipulated settlement, Farmers was not invited to the lunch meeting where Zimberoff, Barker, Harper, and Beal determined that $8.75 million was the appropriate settlement number. The trial court did not abuse its discretion by determining that Farmers was at a disadvantage under this factor.

6. Releasing Party's Investigation and Preparation
¶ 53 The HOA faults the trial court for failing to consider the HOA's thorough and comprehensive investigation of its claims and its related preparation for trial. While it is true that the trial court did not list this particular factor in its ruling, it is clear that the trial court reviewed and considered all the evidence that the HOA presented. Other portions of the ruling directly reference, mostly in regard to the trial court's discussion of collusion, the evidence that the HOA presented along with its efforts to prepare for trial or settlement. Regardless, as mentioned above, under Besel, all of the factors are not necessarily relevant in all cases. Besel, 146 Wash.2d at 739 n. 2, 49 P.3d 887. The trial court's failure to include discussion of this factor in this case does not demonstrate an abuse of discretion.

7. Bad Faith, Collusion, or Fraud
¶ 54 We note that the trial court dedicated several pages of its reasonableness ruling to the collusion factor. Collusion was the main focus of Farmers's argument that the settlement was not reasonable. The trial court was aware of the risk of fraud and collusion in these types of judgments and it began its analysis with discussion of the nature of stipulated judgments with covenants not to execute when combined with assignment of legal claims.
¶ 55 Nevertheless, the trial court concluded that these types of cases are likely a necessary evil, especially when an insurer defends under a reservation of rights. The trial court recognized its important role in these cases to determine whether the settlement is reasonable. The trial court clarified its actions when it moved from the collusion factor to its discussion of the next Chaussee factor:
I want to emphasize that my decision herein is not based solely upon the collusion factor, but rather is based upon all the considerations required by law. Each side has briefed and argued their assessment of the Glover/Chaussee factors.
9 CP at 1765.
¶ 56 Next, the HOA asserts that Farmers had to prove that the settlement was a product of fraud or collusion and that Washington courts cannot infer bad faith, collusion, or fraud based solely on speculation or innuendo. But this is not the correct standard. The Besel court was dealing with a settlement that the trial court found reasonable. Besel, 146 Wash.2d at 739, 49 P.3d 887. "Once the court determined the covenant judgment was reasonable, the burden shifted to [the insurer] to show the settlement was the product of fraud or collusion." Besel, 146 Wash.2d at 739, 49 P.3d 887. Until then, the parties seeking the reasonableness determination presumably bear the burden of establishing reasonableness. Besel, 146 Wash.2d at 739, 49 P.3d 887.
¶ 57 Unlike this burden shifting in Besel, after the parties establish reasonableness, the Chaussee factor is merely whether there is any evidence of bad faith, collusion, or fraud. Chaussee, 60 Wash.App. at 512, 803 P.2d 1339. This is but one of the Chaussee factors that trial courts must consider. Chaussee, 60 Wash.App. at 512, 803 P.2d *1123 1339. Nor does any "evidence of bad faith, collusion, or fraud" appear to invoke the typical standard for proof of fraud, which must be proved by evidence that is clear, cogent, and convincing. See Martin, 141 Wash.App. at 622, 170 P.3d 1198 (quoting Chaussee, 60 Wash.App. at 512, 803 P.2d 1339). The burden here was not on Farmers but, rather, on the HOA to prove its settlement was reasonable.
¶ 58 Rather than describing each of the incidents of alleged collusion that the trial court considered, we will summarize. The trial court indicated that the way that the case shifted abruptly from litigation to collaboration was highly suspect and troublesome. The trial court was clearly bothered by the overall structure of the settlement here; that of a joint effort to create, in a nonadversarial atmosphere, a resolution beneficial to both parties, yet highly prejudicial to Farmers as intervenor.
¶ 59 The trial court found the following circumstances troubling: (1) counsel for the HOA contacted Associates and KPS, adverse parties, without notice to White, wrote a ghost letter for Associates and KPS to send to Farmers critical of White, and recommended that Associates and KPS contact Beal and Harper for independent representation; (2) coverage counsel undermined White's efforts to reduce Associates' and KPS's exposure, presumably by withdrawing White's pending summary judgment motion regarding the HOA's remaining claims; (3) the parties realigned their interests by stipulating that Associates and KPS could recover their $215,000 contribution if the HOA prevailed in its malpractice and bad faith case; (4) the parties appeared to have a joint venture type relationship in which the HOA agreed to kick back some of the proceeds from any recovery from Farmers or White's firm; (5) Beal insisted that the settlement be binding, regardless of the trial court's reasonableness determination; and (6) neither Associates or KPS had any reason to care what dollar amount they agreed to, so long as they could sell it to the trial court as reasonable.
¶ 60 Further, in order for a stipulated judgment amount to serve as the presumptive measure of harm in the bad faith claim against Farmers, the HOA, which now owns the rights to the bad faith claim as part of the settlement, was tasked with convincing the trial court that the settlement amount was reasonable. Besel, 146 Wash.2d at 738, 49 P.3d 887. Without this presumptive value, the HOA must start from scratch to establish damages in the bad faith claim. In addition, as part of the settlement, Beal agreed to testify to the reasonableness of the amount. It is obvious that the HOA expected the trial court to believe Beal's testimony. Unfortunately for the HOA, it did not. The trial court did not err by finding evidence of collusion here.

8. Other Allegations of Error Re: Reasonableness Determination
¶ 61 The HOA argues that the trial court's personal distaste for stipulated judgments impermissibly affected its ruling. But as we discussed above, the trial court considered the HOA's arguments, acknowledging that these types of settlements are nevertheless necessary. The trial court clearly recognized its role in impartially determining the reasonableness of such a settlement.
¶ 62 Next, the HOA faults the trial court's statement that the settlement agreement showed the assignment of a legal malpractice claim and a kick-back provision that resembled a joint venture. It first contends that Associates and KPS merely reserved their rights to pursue their own malpractice claims against their attorneys and to recover the $215,000 cash payment made as part of the overall settlement of their claims, including their malpractice claims. The HOA did not assign malpractice claims. Accordingly, it argues that no joint venture could exist. The HOA misconstrues the trial court's ruling.
¶ 63 The section of the trial court's ruling that the HOA faults includes the trial court's discussion regarding the realignment of the parties. The trial court held:
The fact that Defendants retained the right to recover their $215,000.00 contribution toward the settlement, against the insurers and Mr. White's firm, if Plaintiffs prevailed in the malpractice case and/or bad faith case, is further indication of the *1124 realignment of interests in the case created by the interjection of coverage counsel. The proposal to kick back proceeds of any recovery from the insurers and from Mr. White's firm defined the relationship as a joint venture.
9 CP at 1764. The settlement agreement actually provides:
6. Prosecution of Claims Against [White's firm]. In the event Farmers identifies [White's firm] as an "empty chair" with respect to liability for the unpaid portion of the Stipulated Judgment or asserts an affirmative defense that Farmers is not responsible for [White's firm's] share of liability to [Associates] and KPS, then [Associates] and KPS agree to pursue and control the legal malpractice and Consumer Protection Act claims against [White's firm] for such unpaid portion of the Stipulated Judgment. In such event, [Associates] and KPS shall remain the real party in interest in pursuit of the aforementioned claims against [White's firm]. Furthermore, in such prosecution of claims, Plaintiff shall hold harmless [Associates] and KPS from legal expenses of such prosecution and Plaintiff reserves the right and Defendants agree to amend the Satisfaction of Judgment herein, in the event [Associates] and/or KPS obtain judgment against [White's firm], to allow for execution on the proceeds of such judgment against [White's firm] to the extent necessary to satisfy any unpaid balance on the Stipulated Judgment.
4 CP at 744-45. Therefore, the trial court was correct regarding the malpractice claim. While it is true that Associates and KPS did not assign their malpractice claims, the HOA nevertheless reserved the right to recover on such claims if successful. The HOA's contention lacks merit and the trial court's statement that such relationship resembled a joint venture was not error.
¶ 64 The HOA next assigns error to the trial court's decision to provide "great weight" to Mr. White's analysis of the case, its assertion that "[g]uidance must be had in the most reliable opinions of counsel available," its statement that "Mr. White again comes to the forefront," and its decision when setting a reasonable settlement amount that "[the court] must resort to the expertise of Mr. White." 9 CP at 1763, 1765, 1774. The HOA equates this case to the circumstances in ACLU v. Blaine Sch. Dist. No. 503, 95 Wash.App. 106, 975 P.2d 536 (1999), where the trial court addressed a petition for attorney fees following trial. Rather than making an independent determination of the reasonableness of the hours claimed or the fees charged, the trial court merely awarded an amount defense counsel suggested, which Division One of this court reversed as improper without an independent reasonableness determination. Blaine Sch. Dist., 95 Wash.App. at 120, 975 P.2d 536.
¶ 65 The HOA asserts that the trial court did the same here, repeatedly relying on White's opinions regarding the reasonableness of the settlement instead of reviewing the evidence before it. But the trial court's ruling indicates that the trial court did conduct an independent analysis of the factors contributing to its reasonableness determination. The trial court noted that it did not have the opportunity to narrow the issues by summary judgment and that attempting to determine who would have won was a hypothetical exercise at best.
¶ 66 White reported that the full verdict value of the HOA's case was $200,000 to $500,000. The trial court knew White to be a very experienced and capable attorney with great skill and reputation. In contrast, Beal has never tried a construction defect case, opting instead to handle negotiations. The trial court noted that it never got to rule on White's planned summary judgment motion involving the economic loss doctrine because coverage counsel undermined his plans, but that Todd, White's replacement, felt that such an argument would have been successful. That the trial court chose to place more confidence in White's estimates than Beal's does not establish that the trial court surrendered its independent judgment. This argument lacks merit.
¶ 67 Next, the HOA contends that, contrary to the trial court's finding, White had an incentive to undervalue the case. Specifically, it argues that White was unprepared for trial and would benefit by reducing his *1125 possible exposure in a future malpractice action. The HOA argues that White failed to disclose expert witnesses, failed to produce evidence to counter the HOA's $9.95 million cost-to-repair estimate, failed to file an ER 904 notice in preparation of trial, failed to supplement discovery responses, refused to mediate the case until one month before trial, and failed to file any motions involving the economic loss doctrine. Farmers counters that if White truly feared that he would not be prepared for trial and wanted to reduce his exposure to a malpractice claim, he would have had every incentive to overvalue the case, so that the parties would be more willing to settle. We agree with Farmers.
¶ 68 Regardless, the trial court found that White, "from what [the trial court] saw in court, was skillfully litigating the matter to his clients' benefit." 9 CP at 1763. White had already successfully removed the HOA's warranty claims under the Washington Condominium Act on summary judgment and anticipated success in defending against most of the HOA's remaining claims. We hold that the trial court did not abuse its discretion by finding White's evidence credible and finding that White lacked incentive to unrealistically undervalue the case. Werlinger, 126 Wash.App. at 349, 109 P.3d 22. In sum, we hold that the trial court did not abuse its discretion by ruling that the $8.75 million stipulated settlement was unreasonable.

II. Summary Judgment
¶ 69 The HOA next asks us to review the trial court's decision to grant partial summary judgment on the HOA's warranty claims under the Washington Condominium Act as time barred. We refuse this invitation for multiple reasons.
¶ 70 First, the HOA has fully settled with Associates and KPS, and the HOA has released Associates and KPS from any liability. Any such ruling by this court would be purely advisory.
¶ 71 Further, there is no aggrieved party. RAP 3.1 provides, "Only an aggrieved party may seek review by the appellate court." "An aggrieved party is one whose proprietary, pecuniary, or personal rights are substantially affected." Cooper v. City of Tacoma, 47 Wash.App. 315, 316, 734 P.2d 541 (1987).
¶ 72 Here, the HOA and Associates and KPS have settled all claims. The settlement agreement itself provided that there are no contingencies in the agreement. Further, the settlement provides, under the section titled "Assumption of Risk:"
In providing these mutual full and final releases, the Plaintiff acknowledges that it may not fully know or comprehend all damages they have suffered, but expressly agrees to assume the risk that past, present and future damages of the [HOA] and its members may be greater than currently believed, and that it nevertheless desires to enter into this Agreement. The Plaintiff further acknowledges that the consideration provided in this Agreement is adequate consideration for assuming the aforementioned risks, even though Plaintiff contends that the instant settlement does not represent complete compensation for the damages and losses suffered by it and its members.
4 CP at 656. Thus, the settlement stands regardless of what occurs on appeal.
¶ 73 In summary, the parties that successfully convinced the trial court to grant their motion, Associates and KPS, are not parties to this appeal and have no potential liability from any determination of this court. Farmers did not bring the partial motion for summary judgment and was not a party to the suit at the time the trial court granted the motion. The only remaining issue is between the HOA and Farmers as to whether the trial court abused its discretion by ruling the settlement amount unreasonable. Accordingly, we deny review of the summary judgment dismissal.

III. Order of Dismissal
¶ 74 The HOA alleges that the trial court erred by entering a dismissal order instead of a final judgment. Following the trial court's determination that the settlement amount was unreasonable, the HOA joined with Associates and KPS in a joint motion for entry of judgment, in which the parties asked the trial court to enter judgment *1126 against Associates and KPS, under CR 58,[8] for $8.75 million. The judgment document that the HOA presented to the trial court included a total judgment amount of $8.75 million along with the following statement:
This matter having come before the undersigned Judge of the above-entitled court, upon the motion of plaintiffs, and the Court having reviewed the files and records herein and having received evidence and exhibits supporting this Judgment and having determined the principal amount of the judgment is reasonable for the harm resulting to the judgment creditors, and having been fully informed in the case and notice to the judgment debtor and opportunity to be heard having been provided and good cause having been shown, now, therefore,
JUDGMENT is hereby GRANTED in favor of the judgment creditors in the total sum of $8,750,000.00 as described above.
9 CP at 1792-93.
¶ 75 Farmers asked the trial court not to sign the judgment because evidence did not support it. The language of the proposed judgment directly conflicts with the trial court's ruling that the settlement was unreasonable. The trial court here determined that $400,000 was a reasonable settlement amount.
¶ 76 In Meadow Valley Owners Ass'n v. St. Paul Fire & Marine Ins., 137 Wash.App. 810, 817, 156 P.3d 240 (2007), a case factually similar to this case, Division One of this court analyzed RCW 4.22.060. The Meadow Valley court noted that RCW 4.22.060(1) requires the trial court to determine reasonableness. Meadow Valley, 137 Wash.App. at 816-17, 156 P.3d 240. RCW 4.22.060(2) provides that if the trial court finds the settlement to be unreasonable, the trial court must determine a reasonable amount. Meadow Valley, 137 Wash.App. at 817, 156 P.3d 240. Under RCW 4.22.060(3), the trial court determination that the settlement is unreasonable does not affect the validity of the settlement agreement and the trial court cannot adjust the amount paid under the agreement. Meadow Valley, 137 Wash.App. at 817, 156 P.3d 240. After conducting a statutory interpretation of RCW 4.22.060, Division One held that after a trial court determines a settlement amount is unreasonable, neither RCW 4.22.060 nor case law precludes the parties from agreeing to allow the trial court to enter a new stipulated judgment in the amount the trial court determined reasonable. Meadow Valley, 137 Wash.App. at 822, 156 P.3d 240.
¶ 77 But the HOA did not agree to stipulate to the $400,000 amount the trial court found reasonable because it had already filed an appeal of the trial court's reasonableness ruling. It acknowledged that the trial court had found its initial settlement amount unreasonable. The HOA's proposed solution was to submit a revised proposed judgment that omitted the judgment amount, which it would defer to the trial court's discretion. This, however, violates RCW 4.22.060(3)'s plain language that a trial court cannot adjust the amount paid under the agreement. Rather than entering judgment in any amount, the trial court here dismissed the matter.
¶ 78 Now, on appeal, the HOA asserts that the trial court should have entered judgment in the amount of $400,000. But as we discussed above, the trial court lacked authority to, sua sponte, adjust the settlement amount. RCW 4.22.060(3). The HOA cites Besel, 146 Wash.2d at 738, 49 P.3d 887, in support of its assertion. But Besel is distinguishable as it did not involve a reasonableness determination. Besel, 146 Wash.2d at 735, 49 P.3d 887. Instead, it involved the subsequent bad faith claim against the insurer, addressing what amount should constitute the proper measure of damages when insurers act in bad faith. Besel, 146 Wash.2d at 735, 49 P.3d 887. Our Supreme Court ruled that the amount of the covenant judgment was the presumptive measure of an insured's harm cause by an insurer's tortious bad faith so long as the amount of the judgment is reasonable under *1127 the Chaussee factors. Besel, 146 Wash.2d at 738, 49 P.3d 887. After deciding that the reasonable covenant judgment amount was the correct measure of damages, the Besel court remanded the bad faith claim case to the trial court with instructions that the trial court enter judgment against the insurer in the amount of the covenant judgment. Besel, 146 Wash.2d at 740, 49 P.3d 887. Besel does not support the HOA's claims.
¶ 79 Next, the HOA cites CR 54 and CR 58 for the proposition that the appropriate termination of this case was through entry of final judgment, not dismissal. But neither CR 54 nor CR 58 supports the HOA's proposition. As we discussed above, CR 58 provides that, unless the court otherwise directs and subject to the provisions of CR 54(b), all judgments shall be entered immediately after they are signed by the judge. CR 54 provides the definition of "Judgment," the process for handling judgment for multiple claims and parties, the rules for default judgments, the rules for costs and attorney fees, the rules for preparing a judgment order, and the rules for presenting a judgment to the trial court. See CR 54. Nothing in either court rule requires the trial court to sign an inaccurate or incomplete judgment.
¶ 80 If the HOA wanted some measure of presumptive damages for its bad faith suit against Farmers, it would have agreed to the $400,000 that the trial court found reasonable. To this day, it has not done so. We hold that the trial court did not err by dismissing the HOA's case.
¶ 81 Affirmed.
We concur: VAN DEREN, C.J., and PENOYAR, J.
NOTES
[1] RCW 64.34.300 requires organization of a unit owners HOA consisting of all unit owners.
[2] Paul Nelson also served as president for KPS at all times relevant to this case.
[3] Farmers paid this amount on behalf of Associates and KPS.
[4] The record on appeal includes the trial court's order setting the reasonableness hearing and stating that it would allow oral argument, but no testimony. In addition, the trial court's ruling states that the trial court heard oral testimony from both parties and from Farmers. No transcript from this hearing appears in the record.
[5] CR 58 provides:

(a) When. Unless the court otherwise directs and subject to the provisions of rule 54(b), all judgments shall be entered immediately after they are signed by the judge.
[6] Chaussee v. Maryland Cas. Co., 60 Wash.App. 504, 803 P.2d 1339, 812 P.2d 487, review denied, 117 Wash.2d 1018, 818 P.2d 1099 (1991).
[7] Ek stated that Associates and KPS told her that the only way they would not enter into a covenant settlement agreement was if Farmers removed their reservation of rights, agreed to cover all claims, agreed to defend and indemnify all partners, and agreed to pay attorney fees for Hughes, Beal, and Harper. In return, Associates and KPS would not pursue their bad faith and legal malpractice claims against Farmers. Farmers refused this offer because it never issued an insurance policy to Associates and Associates never paid them any premiums.
[8] CR 58 provides:

(a) When. Unless the court otherwise directs and subject to the provisions of rule 54(b), all judgments shall be entered immediately after they are signed by the judge.