**ASPEN GROVE OWNERS ASSOCIATION,**
Plaintiff,

v.

**PARK PROMENADE APARTMENTS, LLC, et al., Defendants.**

Case No. C09–1110–JCC.

United States District Court,
W.D. Washington,
at Seattle.

Jan. 9, 2012.

Daniel S. Houser, Justin D. Sudweeks, Leonard D. Flanagan, Stein Flanagan Sudweeks & Houser, Seattle, WA, for Plaintiff.

Anthony R. Scisciani, III, Jennifer M. Smitrovich, Scheer & Zehnder LLP, Seattle, WA, for Defendants.

Tyna Ek, Mary R. DeYoung, Paul M. Rosner, Soha & Lang, P.S., Seattle, WA,

for Intervenors Truck Insurance Exchange and Farmers Insurance Exchange.

## ORDER

JOHN C. COUGHENOUR, District Judge.

This matter comes before the Court on Plaintiff's motion for a determination that its settlement was reasonable (Dkt. No. 264), the opposition of Intervenor Truck Insurance Exchange and Farmers Insurance Exchange (Dkt. No. 276), and Plaintiff's reply (Dkt. No. 291). Having thoroughly considered the parties' briefing, the relevant record, and the oral argument held on November 15, 2011, the Court rules as follows.

## I. BACKGROUND

It did not take long for the residents of Aspen Grove Condominium to notice that something was wrong with their homes. Built in 1996 as apartments and converted to condominiums in 2005, Aspen Grove was inspected for damage in October 2007 and found to have extensive signs of water damage. Faced with the need for renovations and repairs, the Homeowner Association ("Association") brought suit in December 2008 against several entities involved in the construction, conversion, and sale of the condominium complex. This Order concerns settlement negotiations between the homeowners association ("the Association") and Shimon Kabili, Michael Bosma, and Melinda Abplanalp, the directors who served as the Association's board between March 23, 2005 and January 30, 2006 ("the Directors").

On September 30, 2010, the parties attended a mediation conference. Farmers Insurance Exchange ("Farmers"), the intervenor insurance company who was defending several of the defendants under a reservation of rights, took the position that it would only indemnify defendants for the portion of any judgment attributable to

additional property damage caused by a breach of fiduciary duty, and offered to settle the case for $160,000. No settlement was reached. On March 2, 2011, a month before trial, the parties attended a second mediation. Farmers offered $230,000. The Directors claimed that their assets were exceeded by their liabilities, and as such, could not be contributed to any settlement. The Association made a settlement offer to Farmers of $3.75 million in cash. Less than twenty-four hours later, however, the Association and the Directors settled for a $5.75 million stipulated covenant judgment, in which the Association agreed to drop all claims against the Directors and go after Farmers exclusively. The Association now seeks a determination from the Court that this settlement was reasonable.

## II. DISCUSSION

Washington Courts have adopted a set of nine factors for evaluating whether a consent judgment with a covenant not to execute presents sufficient evidence of a reasonable settlement. These factors are:

> [T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.

*Chaussee v. Md. Casualty Co.*, 60 Wash. App. 504, 512, 803 P.2d 1339 (Wash.Ct. App.1991). No one factor controls and the trial court has the discretion to weigh each case individually. *Id.*

■ The Association stated that it would have asked for $8,463,679 at trial.

The settlement amount of $5,200,000 represents a 38.5% reduction of that amount. To calculate a reasonable settlement, the Court will rely on the *Chaussee* factors in two ways. First, it will adjust the damage amounts provided by the Association. Second, it will make a percentage reduction based on the remaining relevant factors.

### A. The Association's Damages

#### a. Repair Costs

The largest amount of damages is the repair costs. The Association submits an estimate from Charter Construction in the amount of $4,957,436.40. Farmers retorts that Charter has a history of submitting an inflated bid for litigation purposes and then renegotiating the actual cost of repair after the settlement. (Dkt. No. 281 ¶¶ 6–10.) Defense expert, McBride Construction, submitted a repair estimate of $3,190,082. After carefully reviewing the details of the two estimates, the Court concludes that the McBride estimate is the more reasonable of the two.

#### b. Project Management

The Association argues that project management expenses are typically five percent of the total repair cost. (Dkt. No. 268 at ¶ 4.) Farmers does not provide an alternative metric for calculating project management costs, so the Court will accept the Association's figure. At five percent of $3,190,082, the project management costs are $159,500.

#### c. Loss of Use and Diminution in Value

The association estimates damages for loss of use and diminution in value to be $963,012, or approximately $10,000 for each of the 96 units. Farmers retorts that the Association's damages should be as-

sessed as the *lesser* of the repair costs *or* diminution in value, but not both. *Water's Edge Homeowners Ass'n v. Water's Edge Assocs.*, 152 Wash.App. 572, 216 P.3d 1110, 1119 (2009). With respect to loss of use, Farmers argues that the Association has provided no proof that the unit owners will lose the use of their homes during the construction process. Indeed, a defense expert testified that the unit owners would not be required to move while the repairs were being completed. (Dkt. No. 280, Ex. AA at 40:21–42:23.) The Court finds that a figure of $1,000 is a more reasonable representation of the inconvenience the unit owners would suffer while their homes are being upgraded. Accordingly, the Court finds loss of use damages of $96,000.

The Association states that it is entitled to an award of attorney fees in the amount of $2,240,385. The Association's counsel states that it has spent 2,082 hours on this case, and that it is entitled to an hourly rate of $275 as well as a multiplier of 1.4 to reflect the high-stakes nature of the case. Farmers responds that the Association's counsel has failed to discount the hourly total for work spent on unsuccessful claims and duplicated effort. *See Bowers v. Transamerica Title Ins. Co.*, 100 Wash.2d 581, 675 P.2d 193, 203 (1983). Reviewing the Association's counsel's billing report, the Court finds that an hourly total of 2000 hours is appropriate. At an hourly rate of $275 and a multiplier of 1.4, the total attorney fees amount to $770,000.[1]

Finally, the Association states that it spent $54,975 on emergency repairs. (Dkt. No. 268 ¶ 4.) Farmers does not dispute this amount.

These revisions provide a total of $4,270,057.

---

1. The Court agrees with the Association that the WCA creates a cause of action for their claims and provides for attorney fees. RCW 64.34.100(2) & .455.

### B. The Merits of the Association's Liability Theories

The first of the Association's theories is that the Directors owed a fiduciary duty of care to the unit purchasers at Aspen Grove under RCW 64.34.308(1) and that this duty was breached when the directors did not order an inspection on the condominium. Farmers argues that a claim for breach of fiduciary duty sounds in tort, and that the Association must therefore prove that the claimed breach proximately caused the injury. *Miller v. United States Bank of Washington, N.A.,* 72 Wash.App. 416, 865 P.2d 536, 543 (1994). The Court is doubtful that the failure to inspect the property *caused* the water damage. Defendant directors sat on the board for ten months. (Dkt. No. 210 at ¶ 11.) Inspections are required every year. (Dkt. No. 214, Ex. D at Section 12.6) Even if, as the Association insists, the directors failed to arrange for an inspection during their tenure, the Court is doubtful that the failure to order a single inspection over the life of a fifteen-year-old condominium was responsible for all the water damage suffered by the units.

At the time of settlement, the parties had submitted briefing on the issue of whether or not actual knowledge of the damage and decay was required of the defendants in order to prevail on an action for breach of fiduciary duty. (Dkt. No. 197.) The Court will not answer this question after the completion of settlement negotiation, because the parties settled based on the information they had available to them. It was, however, an area of weakness in the Association's case.

The second of the Association's theories is that the Directors were liable under RCW 64.34.405, .100(2), and .455 for unreasonable omissions from the public offering statement ("POS") that they delivered to the unit purchasers. This was not a slam-dunk argument. The Association argues that declarants should have included the condition of all structural components in the POS pursuant to RCW 64.34.415(a), but the Association's reading of the statute is hotly contested. The statute only requires that structural components be inspected "to the extent reasonably ascertainable," and it is not clear that in 2005, prior to the passage of an amendment to the Washington Condominium Act which included strong protections for unit purchasers, information that could only be acquired through invasive inspections was "reasonably ascertainable." This was an open question that could have cut against either party.

The final of the Association's theories is that the condition of Aspen Grove was a breach of the warranty of suitability (RCW 64.34.445). The Association argues that the ongoing water intrusion problem is likely to continue to create severe deterioration throughout the complex. Again, this argument was not a sure thing. The Association would have been required to prove the condition of the building at the time of conveyance, something it was not able to do during the course of the litigation.

### C. Measure of Damages for Breach of Fiduciary Duty

Because the insurance policy at issue in this matter is limited to breach of fiduciary duty, the proper measure of damages for this claim is of paramount importance. The Association argues that the correct measure of damages when a director breaches fiduciary duties is the cost of repairing the damage that should have been addressed during the period of declarant control. In support, the Association cites a Massachusetts case that holds:

> When a breach of trust occurs, the beneficiary of the trust is "entitled to be put in the position he would have been in if no breach of fiduciary duty had been

committed." *Fine v. Cohen*, 35 Mass. App.Ct. 610, 616, 623 N.E.2d 1134 (1993). Cf. Restatement (Third) of Trusts § 205(b) (1990) (trustee who commits breach of trust is "chargeable with the amount required to restore the values of the trust estate and trust distributions to what they would have been if the trust had been properly administered"). Thus, a trustee who breaches his fiduciary duty to "maintain, repair, and replace" common areas is liable for the cost of returning the unit owners' association to the position that it would have been in had such steps been undertaken.

*Berish v. Bornstein*, 437 Mass. 252, 270–271, 770 N.E.2d 961 (Mass.2002)

There are several problems with this authority. What the Association neglects to mention is that the Court goes on to hold that "In circumstances such as those present here, where the cost of repair and replacement, if undertaken, would have been assessed against the unit owners association as 'common expenses,' the liability of a trustee (if any) would be limited to additional costs incurred as a result of the delayed undertaking of those tasks." *Id.* Farmers contends that because repairs would have been assessed against all owners, the Directors are not liable for repair costs. The Association argues that if the proper inspections had been made, the Board would have "pursued a claim against the declarants before $4.52 million in profits were transferred away." This is a questionable assertion. The Court finds it much more likely that the repair costs would have come from an assessment against the owners. The Association offers no evidence to show the amount of costs incurred as a result of the delayed undertaking of repairs.

Even if the Association had presented a complete and correct quotation, the case would not be an accurate statement of Washington law. In *Water's Edge Homeowners Ass'n v. Water's Edge Assocs.*, 152 Wash.App. 572, 216 P.3d 1110 (2009), the court held that where breach of warranty claims had been dismissed, and only breach of fiduciary duty and tort claims remained, "the normal cost of repair damages under the HOA's warranty claims were unavailable." *Id.* at 1119. Cost of repair, then, is not the proper measure of damages for a breach-of-fiduciary-duty claim.

Farmers argues that the measure of damages for such a claim is best calculated by looking at similar cases. Farmers submits a declaration listing the amounts of various settlements for cases with similar facts. The average settlement value for these claims is $250,000 and no settlement has ever exceeded $500,000. (Dkt. No. 286 at ¶ 4.) Farmers challenges the Association to provide an example of a case where claims for breach of fiduciary duty settled for more than $300,000 and the Association provides no response.

### D. Merits of the Alleged Defenses

When the parties reached a settlement, there were several defense motions ripe for consideration: a motion for partial summary judgment seeking dismissal of the Association's claims for breach of fiduciary duty, fraudulent concealment, misrepresentation and breach of contract (Dkt. No. 197) and (2) a defense motion to dismiss or, in the alternative, to exclude the Association's experts for their failure to make proper disclosures under Fed. R.Civ.P. 26(a)(2)(B). (Dkt. No. 232.) Again, the Court is not going to rule on these motions in this Order, but there was substance to them and they presented a real challenge to the Plaintiff's case.

### E. Defendant's ability to pay

 Toward the end of the mediation process, the mediator determined that the

Defendants had no significant assets and could not have paid a judgment themselves. (Dkt. No. 269 Ex. D.) The Association states, without any real support, that this factor weighs in favor of a determination that the settlement was reasonable. Farmers insists that this factor is a strong indication of unreasonableness. Farmers has the better of the argument. Washington case law recognizes that "the reasonableness of a settlement with an insured who is not personally liable for a settlement is open to question because the insured will have no incentive to minimize the amount." *Werlinger v. Warner*, 126 Wash.App. 342, 109 P.3d 22, 27 (2005) (citing *Besel v. Viking Ins. Co.*, 146 Wash.2d 730, 49 P.3d 887, 891 (2002)). In *Werlinger*, the court went on to note that the strength of the plaintiff's case against the defendant was "not relevant in view of the fact that not a penny could ever be collected from [defendant] personally." *Id.* at 27. This is persuasive reasoning. It is difficult to imagine that Defendants in this case obtained the best possible settlement when they had no apparent incentive to do so. The final settlement amount must be discounted to reflect that reality.

### F. Other Factors

After carefully considering the parties' briefing, the Court is not convinced that the remaining *Chaussee* factors are significant enough to warrant inclusion in the Court's reasonableness determination.

### III. CONCLUSION

Plaintiff's motion for a determination that the settlement was reasonable is DENIED. (Dkt. No. 264.) The Association's revised total damages are $4,270,057. Taking into account weaknesses in the Association's arguments, evidentiary problems with the Association's case, and the Directors' inability to pay, the Court finds that a reasonable reduction would have been 55%. This results in a settlement value of $1,921,525.70.

Of that amount, the Court finds that $300,000 should be apportioned to the claim for breach of fiduciary duty.