FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 JAN 13 AM 10: 20



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MWW, PLLC, a Washington Professional Limited Liability Company and DENNIS MORAN, | No. 69109-1-I |
| Respondents, | DIVISION ONE |
| v. | |
| KIRIBATI SEAFOOD COMPANY, LLC, a Washington Limited Liability Company; OLYMPIC PACKER, LLC, | UNPUBLISHED OPINION |
| Defendants, | |
| MONITOR LIABILITY MANAGERS LLC and CAROLINA CASUALTY INSURANCE COMPANY, | |
| Appellants. | FILED: January 13, 2014 |

SCHINDLER, J. — Carolina Casualty Insurance Company, the legal malpractice

liability insurer for Moran, Windes, and Wong PLLC (MWW); and Monitor Liability

Managers LLC, the managing general underwriter for Carolina, appeal the "Order

Determining Reasonableness of Settlement" between MWW, Kiribati Seafood Company

LLC, and Olympic Packer LLC. We affirm.

## FACTS

Nicholas Coscia and Charles Crovo own Kiribati Seafood Company LLC and Olympic Packer LLC (Kiribati). Dennis Moran and Moran, Windes, and Wong PLLC (MWW) represented Kiribati in several legal matters, including a lawsuit against the Tahiti Port of Papeete for damage to a Kiribati fishing vessel. The December 18, 2004 fee agreement required Kiribati to pay $10,000 each month plus costs and expenses and a 25 percent contingency fee on the Tahiti judgment.

In September 2008, Kiribati and Moran modified the terms of the December 2004 fee agreement to provide for a liquidated sum of $250,000 and 18.5 percent contingency fee. Kiribati also agreed that Moran was entitled to "a first priority lien on . . . any Gross Recovery" from the Tahiti case. The agreement states, in pertinent part:

> The Gross Fee shall be due when any Gross Recovery is received by or controlled by the client, its principals or agents . . . . Client grants Moran a first priority lien on the cases, files and any Gross Recovery and proceeds to secure the Gross Fees and expenses.

In January 2008, the Tahiti court entered a judgment in favor of Kiribati for approximately $7 million. MWW served notice of the lien on Dechert LP, the Paris law firm representing Kiribati.

On May 5, 2010, Dechert advised MWW that Kiribati would receive the first payment on the judgment in the Tahiti case in the amount of $864,000, and requested verification of the amount owed to MWW. After Kiribati "refused to discuss when, then if, they would pay MWW," Dechert's managing partner "advised MWW that it would not respect MWW's lien."

2

On May 25, MWW filed a breach of contract and lien foreclosure action against Kiribati Seafood Company LLC, Olympic Packer LLC, Lawrence Crovo, Charles Crovo, and Nicholas Coscia (collectively Kiribati). MWW alleged that the proceeds from the judgment in the Tahiti lawsuit were subject to its first priority lien.[1] MWW claimed Kiribati owed approximately $1 million in attorney fees and costs.

Shortly after filing the complaint, MWW filed a motion asking the court to order the transfer of $582,434 from the proceeds of the Tahiti judgment into the King County Superior Court registry and appoint a receiver. The court granted the motion. The court ordered Kiribati to transfer the funds by July 25, 2010 and appointed a receiver.

Kiribati filed an answer and counterclaims against MWW and Moran. Kiribati denied the Tahiti judgment was subject to the lien foreclosure action. Kiribati asserted as an affirmative defense that the contingency fee agreement violated the Rules of Professional Conduct and was void. In the counterclaim against MWW, Kiribati alleged Moran was negligent in "failing to perform his legal services in a manner in conformity with the applicable standards of care," breach of fiduciary duty, and violation of the Washington Consumer Protection Act, chapter 19.86 RCW. Kiribati sought damages against MWW and Moran in excess of $2.5 million.

Carolina Casualty Insurance Company was the legal malpractice carrier that insured MWW and Moran. Monitor Liability Managers LLC was the managing general underwriter for Carolina (collectively Carolina). The malpractice insurance policy had an aggregate limit of $1 million. Carolina agreed to defend MWW and Moran under a reservation of rights.

---

[1] MWW also alleged that Kiribati violated the Uniform Fraudulent Transfer Act, chapter 19.40 RCW. MWW's amended complaint added the individual defendants and claims for theft of services, conversion, and fraud.

Because Kiribati did not comply with the court order to deposit the Tahiti proceeds into the court registry, the receiver filed a motion for contempt. The court granted the motion for contempt. The court found that Charles Crovo on behalf of Kiribati "intentionally violated this Court's Order." The August 26, 2011 order directs Crovo to deposit funds into the court registry and imposes a $2,000 per day sanction for failure to do so. Crovo deposited $315,000 into the court registry: $75,000 on September 30 and $240,000 on October 3. On December 14, Dechert deposited into the court registry a payment from the Port of Papeete of $511,611.42. Dechert told the receiver additional payments were "expected soon."

Several of Kiribati's creditors intervened in the lawsuit and asserted claims against Kiribati. As of March 2, 2012, there was approximately $1.3 million in the court registry. The receiver reported to the court, "It appears that the potential sum of claims of all creditors exceeds the Tahiti Court proceeds by hundreds of thousands of dollars."

For more than two years, Kiribati, MWW, and Moran engaged in contentious litigation, including extensive discovery, joinder of multiple parties, and a number of motions for summary judgment. The three-week trial was scheduled to begin on June 11, 2012.

On April 17, Kiribati filed a motion for partial summary judgment arguing MWW could not recover under the fee agreement or establish fees under a quantum meruit theory. MWW filed a motion for partial summary judgment to dismiss Kiribati's legal malpractice counterclaims.

On April 18, MWW, Moran, and Kiribati spent more than 12 hours in settlement negotiations with mediator Lou Peterson. Carolina's coverage attorney Paul Fogarty attended the mediation. Carolina's senior claims attorney Temperance Walker participated by phone. The parties tentatively agreed to settle the attorney fee claims for $600,000 and the counterclaims for $400,000. Despite the mediator's "efforts over the next few weeks to hammer out a deal," the parties did not finalize the agreement.

On April 19, the court entered a judgment for CR 37 sanction against Kiribati in the amount of $28,395.43. On May 18, the court heard oral argument on the motions for summary judgment. The court denied the motion to dismiss the counterclaims. The court reserved ruling on Kiribati's motion for partial summary judgment.

Over the next four days, the parties renewed efforts to settle. The parties exchanged several offers through the mediator and on May 22, entered into a settlement agreement and release. MWW agreed to settle the attorney fee claim for $550,000 and to execute a satisfaction of the April 19 CR 37 judgment against Kiribati. Kiribati agreed to settle the counterclaims against MWW for $550,000. The parties agreed to execute a mutual release "of all possible claims and causes of action." MWW released "those claims that were or could have been asserted in the Litigation including against the proceeds of the Judgment in the matter Kiribati Seafood Company, et al. v. Port of Papeete et al." The settlement was subject to approval of the court following a reasonableness hearing. The "Confidential Settlement Agreement and Release" provides, in pertinent part:

> A.     Kiribati shall pay $550,000 in full and final settlement of MWW, PLLC's fee claims and lien and MWW PLLC's insurer shall pay Kiribati $550,000.00 in full and final settlement of its legal malpractice and breach of fiduciary duty claims. Payment shall be accomplished as

5

follows:

1. Within 10 (ten) calendar days of approval by the Court of this settlement agreement at a reasonableness hearing, MWW's insurer shall pay the full $550,000.00 into an escrow agreed by MWW and Kiribati. Upon payment by MWW's insurer of the full $550,000 into the agreed escrow, the following shall promptly and simultaneously occur:

2. The escrow shall pay Kiribati $550,000.00 by check and Kiribati shall immediately endorse this check back to the escrow.

3. The escrow shall immediately pay MWW, PLLC $550,000.00 by check.

B. Simultaneously with the execution of this agreement, MWW, PLLC shall execute a satisfaction of the Judgment entered against Kiribati, Coscia and Crovo in the amount of $28,395.43 on April 19, 2012 which Kiribati may immediately file with the court.

On May 23, Kiribati's attorney notified the court that the parties had reached a settlement. On May 31, MWW filed a "Motion for Determination of Reasonableness of Settlement." MWW provided Carolina and the creditors with notice of the reasonableness hearing scheduled for June 8. Moran, MWW attorney William Walsh, and Kiribati attorney John Neeleman submitted declarations in support of the reasonableness of the settlement agreement.

Carolina intervened and challenged the reasonableness of the settlement. Carolina claimed the agreement was collusive. Carolina submitted a declaration from senior claims attorney Walker stating that Carolina "was excluded from the negotiations that led to [the April 18] tentative deal" and was "again excluded from the settlement talks that led to the current proposed settlement of $550,000."

In response, MWW submitted a declaration from MWW attorney Walsh. Walsh states Carolina's attorney attended the April 18 mediation and he kept Carolina informed of the settlement negotiations after the April 18 mediation.

6

At the reasonableness hearing on June 8, Carolina did not challenge the reasonableness of the amount the parties agreed to as part of the settlement agreement. Carolina argued that the settlement was collusive because it was "largely precluded from settlement talks."

The court found the argument that Carolina was excluded from settlement negotiations was "without merit" and rejected the claim that the settlement was collusive. The court ruled, in pertinent part:

> [I]n terms of collusion, I can't think of another set of attorneys and parties that are less likely to collude than this group. If there was an argument to be made over five bucks, they would have spent $500 arguing over it. . . . And again, they had a very well-respected mediator, they intensely participated in mediation, they were going right up to trial, their claims were both hard fought. There simply is no basis to find collusion.

The court concluded that the settlement was reasonable. The court stated, "[T]his was probably a more transparent case than most cases, given the amount of preparation and summary judgment motion practice that went into it. . . . [I]t's very apparent to me, given my knowledge about this case, that this is a fair settlement."

The court order determining the reasonableness of the settlement sets forth detailed findings of fact. The court found that the structure of the settlement to pay the insurance money into an escrow was reasonable given the "intervention of several creditors, the presentation of various judgments and filing of competing security interests, and the history of money tracing problems and contempt orders." The court concluded as a matter of law that the settlement "is reasonable and prudent under the circumstances, under RCW 4.22.060 and under the Glover[2] factors."

Carolina appeals the determination that the settlement was reasonable.

---

[2] Glover v. Tacoma General Hospital, 98 Wn.2d 708, 717, 658 P.2d 1230 (1983), overruled on other grounds by Crown Controls, Inc. v. Smiley, 110 Wn.2d 695, 756 P.2d 717 (1988).

ANALYSIS

For the first time on appeal, Carolina argues the court did not have the authority to hold a reasonableness hearing under RCW 4.22.060. Carolina concedes it did not challenge the trial court's authority below to hold a reasonableness hearing. We do not address arguments that were not presented to the trial court and are raised for the first time on appeal. RAP 2.5(a); Lunsford v. Saberhagen Holdings, Inc., 139 Wn. App. 334, 338, 160 P.3d 1089 (2007).

Next, Carolina argues the court erred in concluding the settlement was reasonable under the Glover v. Tacoma General Hospital, 98 Wn.2d 708, 717, 658 P.2d 1230 (1983), factors. We review a trial court's reasonableness determination for abuse of discretion. Water's Edge Homeowners Ass'n v. Water's Edge Assocs., 152 Wn. App. 572, 584, 216 P.3d 1110 (2009). A superior court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or untenable reasons. Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006).

The determination of reasonableness necessarily involves findings of fact which will not be disturbed on appeal if supported by substantial evidence. Schmidt v. Cornerstone Invs., Inc., 115 Wn.2d 148, 158, 795 P.2d 1143 (1990) (citing Glover, 98 Wn.2d at 718). "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the stated premise." Schmidt, 115 Wn.2d at 158. Unchallenged findings of fact are verities on appeal. Zunino v. Rajewski, 140 Wn. App. 215, 220, 165 P.3d 57 (2007).

Under Glover, the court must consider the following factors in making a reasonableness determination: (1) the releasing person's damages; (2) the merits of

8

the releasing person's liability theory; (3) the merits of the released person's defense theory; (4) the released person's relative faults; (5) the risks and expense of continued litigation; (6) the released person's ability to pay; (7) any evidence of bad faith, collusion, or fraud; (8) the extent of the releasing person's investigation and preparation; and (9) the interests of the parties not being released. Glover, 98 Wn.2d at 717.

Carolina asserts the record does not support the finding the agreement was not collusive. The findings of fact state, in pertinent part:

> The Court finds that the settlement was negotiated in good faith, at arm's length through a competent mediator and there is no evidence of collusion or fraud. . . . The claim that [Carolina] was "shut out" from settlement negotiations is without merit. The Court finds no basis to find that the settlement agreement was a result of bad faith, collusion or fraud.[3]

Substantial evidence supports the trial court findings that the settlement agreement was negotiated in good faith and there was no evidence of collusion. The record shows that the parties had engaged in extensive negotiations with the mediator beginning in April, and the unchallenged finding establishes the parties "participated in good faith, arm's length settlement negotiations which included an independent mediator, on and off since April, 2012."

On April 18, the mediator spent more than 12 hours with MWW and Kiribati in mediation. According to Kiribati's attorney, "For most of the mediation the parties were more than $1 million apart -- Kiribati demanding over $500,000 net recovery and MWW demanding over $500,000 net recovery." Late in the evening, the parties reached a tentative agreement to settle the attorney fee claim for $600,000 and the counterclaims for $400,000, but the parties were unable "to finalize the tentative agreement."

---

[3] Carolina does not challenge the finding that the case involved "more than two (2) years of contentious litigation by all parties leading to this settlement agreement."

On May 3, Kiribati's attorney offered to settle the counterclaims for $600,000 and satisfaction of the April 19 judgment against it for $28,395.43 if MWW agreed to settle the fee claim for $550,000. After the May 18 hearing on the motions for partial summary judgment, MWW offered to settle the attorney fee claim for $550,000 if Kiribati would settle the counterclaims for $550,000. Kiribati rejected the offer.

Over the weekend, Kiribati made a counteroffer through the mediator to settle the counterclaim for $750,000 and the attorney fee claim for $450,000. On Tuesday, May 22, Kiribati's attorney called the mediator and urged him to contact MWW again. Kiribati's attorney was concerned about the "immense amount of work and expense and potential vagaries and risks inherent in any three week jury trial." MWW expected "its expenses and costs of trial preparation and a three-week trial to be around $180,000." MWW told the mediator it was also concerned that "the uncertainty of trial remains and so does the risk of MWW's potential exposure well beyond its insurance limits." The mediator contacted Kiribati's attorney the afternoon of Tuesday, May 22. The mediator said MWW would agree to settle the fee claim for $550,000 and execute a satisfaction of the April 19 judgment if Kiribati would settle the counterclaims for $550,000. Following a "difficult and searching discussion," Kiribati accepted the offer.

In the declaration submitted in support of the reasonableness hearing, Moran states that "[t]he agreement was the product of a long and drawn out negotiations process over the last two years." Kiribati's attorney Neeleman states that the two years of litigation were "vigorous and taxing" and that "[e]ach side believed that the claims and defenses they had asserted in the litigation had substantial merit."

10

Carolina also asserts the structure of the settlement shows the agreement was collusive because it involved a "pass-through" payment from MWW's insurer to the court escrow and then to MWW. The trial court's findings state, in pertinent part:

> The Court finds that the structure of the settlement is reasonable. The Court finds that under the circumstances of this case with the appointment of a Receiver, the intervention of several creditors, the presentation of various judgments and filing of competing security interests, and the history of money tracing problems and contempt orders related thereto, it is reasonable for the parties to structure the $550,000 insurance payment into an escrow rather than have it paid into the registry of the court or directly to Kiribati. The Court finds it is reasonable for the MWW fee claim to be paid out of that escrow, under these circumstances where MWW has a priority attorney's fee lien claim on the proceeds. The Court record contains ample evidence, including numerous Receiver reports, regarding the funds currently in the Court's Registry, amounts claimed by various creditors and the potential disposition of those funds.

Substantial evidence supports the findings. The record shows that several of Kiribati's creditors intervened claiming almost $700,000. One of the intervenors asserted a preferred maritime wage lien. Kiribati's attorney states in his declaration that Moran's $1 million attorney fee claim was the largest of the claims against the Tahiti proceeds and "Kiribati's members were anxious to ensure that they would realize a net recovery from the Court registry." The receiver also described the difficulties of tracing funds, the amounts claimed by Kiribati's other creditors, and the concern that those amounts exceeded the amount in the court's registry.[4]

---

[4] Carolina also argues that the settlement was collusive because MWW had an incentive to inflate the settlement amount. But Carolina did not argue below and does not argue on appeal that the $550,000 amount was unreasonable. RAP 2.5(a); Lundsford, 139 Wn. App. at 338. Therefore, we need not address this argument.

In addition, Carolina claims the court improperly addressed coverage in a handwritten finding and substantial evidence does not support the finding.[5] The handwritten finding states: "Kiribati's settlement offer of May 18 was timely [and] almost immediately communicated to [Carolina]; [Carolina] did not timely respond."

Below, the parties argued the court should "not address underlying coverage issues between Moran and [Carolina]" in ruling on the reasonableness of the settlement. The court agreed and suggested adding language to that effect in the order:

> THE COURT: What if we were to add a sentence that coverage issues are not before the court?
> [CAROLINA]: If the court were to say coverage issues are not before the court, and the court is not ruling at this time that it would be reasonable for [Carolina] to have to pay that amount, I could live with that.

Accordingly, the order expressly states: "This Order does not include any determination of coverage issues between MWW, PLLC, Mr. Moran and [Carolina]." In context, it is clear that the handwritten finding related to timeliness is not related to coverage. The finding is in response to Carolina's argument that it was excluded from the settlement negotiations. The findings that include the court's handwritten footnote state:

> The Court finds that the settlement was negotiated in good faith, at arm's length through a competent mediator and there is no evidence of collusion or fraud. [Carolina]'s coverage counsel, Paul Fogarty, attended the entire April 18, 2012 mediation in person. Ms. Walker had the opportunity to attend the mediation in person but chose to attend by phone, which was a business risk [Carolina] chose to take.* The claim that [Carolina] was "shut out" from settlement negotiations is without merit. The Court finds

---

[5] Carolina also argues it "never had a meaningful opportunity to respond before the hearing" and that the finding was not supported by admissible evidence. Carolina cites no authority to support these arguments and does not identify why the evidence was inadmissible. We treat a party's failure to cite any authority as a concession that the argument lacks merit. State v. McNeair, 88 Wn. App. 331, 340, 944 P.2d 1099 (1997).

no basis to find that the settlement agreement was a result of bad faith, collusion or fraud.

. . . .

\* Kiribati's settlement offer of May 18 was timely [and] almost immediately communicated to [Carolina]. [Carolina] did not respond.

Substantial evidence also supports the handwritten finding. MWW attorney Walsh states that he informed Carolina about the May 18 offer "the same day by email and received no response." Walsh states that from May 18 to May 22, "both Mr. Moran and I attempted to communicate continually with Ms. Walker regarding the settlement communications that were taking place."

We affirm.

Schindler, J.

WE CONCUR:

Appelwick, J.          Becker, J.

13