**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 5, 2021

Gonzáleg C.J.
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 5, 2021

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| JEFFREY WOOD and ANNA WOOD, husband and wife,<br><br>      Petitioners,<br><br> v.<br><br>MILIONIS CONSTRUCTION, INC., a Washington corporation; STEPHEN MILIONIS, an individual,<br><br>      Defendants,<br><br>CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY, an insurance corporation,<br><br>      Respondent. | NO. 98791-2<br><br><br><br>Filed: August 5, 2021 |

STEPHENS, J.—This case involves the familiar "covenant judgment" arrangement, in which an insured defendant, facing suit by a plaintiff, settles claims without the insurer's consent in exchange for a release from liability and assignment of potential bad faith claims against the insurer to the plaintiff. If the trial court deems the settlement reasonable, that settlement amount becomes the presumptive measure of

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

damages in the later bad faith action brought by the plaintiff against the insurer. *Bird v. Best Plumbing Grp., LLC*, 175 Wn.2d 756, 761, 287 P.3d 551 (2012).

Here, the insurer, Cincinnati Specialty Underwriters (Cincinnati), challenges the trial court's order approving as reasonable a $1.7 million settlement between the plaintiffs, Anna and Jeffrey Wood (Woods), and Cincinnati's insureds, Milionis Construction Inc. (MCI) and Stephen Milionis. A divided Court of Appeals panel held the trial court abused its discretion because the reasonableness finding credited a defense expert's evaluation of contract damages at $1.2 million despite other evidence in the record suggesting the defense's evaluation of damages never rose above $399,000.

We reverse the Court of Appeals and reinstate the trial court's order. The trial court properly conducted the reasonableness hearing and evaluated the varied and conflicting evidence of contract damages. In addition, the court appropriately considered damages for the plaintiffs' extracontractual claims as well as allowable attorney fees. In finding an abuse of discretion, the Court of Appeals majority misapprehended parts of the record and substituted its assessment of the competing damages evaluations for the trial court's assessment. We also hold the trial court acted within its discretion in denying Cincinnati's request for a continuance and additional discovery.

RELEVANT FACTS

As the Court of Appeals dissenting judge aptly observed, this case is about a "dream house turned into a nightmare." *Wood v. Milionis Constr., Inc.*, No. 36286-8-III, slip op. dissent at 1 (Wash. Ct. App. Apr. 28, 2020) (Fearing, J., dissenting), https://www.courts.wa.gov/opinions/pdf/362868_unp.pdf. The Woods and MCI executed a contract in July 2015 for the construction of a single-family residence in Newman Lake, Washington. As general contractor, MCI assumed responsibility for the management, supervision, and administration of construction. The original contract price for completion of the home was $1,356,000. Following several issues with faulty workmanship, construction ceased on the home in November 2016, at which point the Woods had paid about $570,000 of the original contract price to MCI. The house remained "substantially incomplete" with portions of the home "open to the elements going into the winter months." Clerk's Papers (CP) at 10, 500. Additionally, negligent and defective work created multiple structural defects.

The Woods sued MCI and Stephen Milionis on November 18, 2016.[1] The Woods claimed breach of contract; unjust enrichment; promissory estoppel; breach of contractual duties of good faith and fair dealing; negligence; negligent

---

[1] MCI's insurer in this case, Cincinnati, was also listed as a defendant in the case title for the complaint as well as the later stipulated judgment. Cincinnati accurately notes it was not a party to this case until its motion to intervene was granted. CP at 173, 638-41.

representation; violation of the Consumer Protect Act (CPA), ch.19.86 RCW; and bond recovery. MCI's general liability insurer, Cincinnati, retained attorney Shane McFetridge to represent MCI and Milionis but reserved the right to deny or limit coverage. MCI and Milionis also retained personal defense counsel, Brook Cunningham. Pursuant to the construction contract, the parties agreed to engage in mediation and, if necessary, arbitration.

Initial Expert Evaluation of Damages

After the Woods filed suit, all parties hired experts to evaluate the structural defects and cost to complete the Woods' home. Their calculations varied significantly. Plaintiffs' expert Andy Smith estimated the cost to remedy all alleged defects at $761,234.09 and the cost to complete the home at $1,941,965.02 for a total cost of over $2.7 million, not including general and consequential damages for the Woods' other claims. In contrast, defense expert Nick Barnes estimated the cost to repair the alleged defects at $540,341.76 and the cost to complete construction at $674,292.19 for a total of approximately $1.2 million. Barnes's estimate for the cost to complete construction was never incorporated into the defense's calculations for liability because the parties' contract indicated the Woods were entitled to such costs only if "the cost to complete the work . . . exceeds the contract price." CP at 423-24. McFetridge, Cincinnati's retained counsel for MCI and Milionis, noted that "[w]ith $807,135.97 remaining on the contract, our experts believe that there should

be sufficient funds remaining to complete construction of the home without regard to the construction defects." *Id.* at 424. Based on Barnes's calculations, another defense expert, Scott Buckles, analyzed the projected liability against MCI and Milionis to remedy only certain defects, but he did not discuss damages for the cost to complete the project. Buckles believed the defendants bore 65 percent liability for some, but not all, of the alleged defects for a total cost of $146,102.18.

Unsuccessful Mediations

The parties participated in three unsuccessful mediations over the course of a year. Cincinnati remained involved in all three mediations and participated in significant discovery through at least October 2017. The Woods allege the highest settlement authority Cincinnati ever provided defense counsel at the three mediations—$60,000.00—was "less than twenty percent . . . of the recommended settlement authority sought by its counsel." *Id.* at 42. Prior to the third mediation in October 2017, McFetridge requested settlement authority of $350,000.00 based on defense expert Buckles's evaluation of damages and estimated attorney fees. Cincinnati did not supply McFetridge with that requested authority. Nevertheless, the parties tentatively agreed to settle the case in favor of the Woods for $399,514.58. The settlement was contingent on Cincinnati agreeing to fund the settlement, which it never did.

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

After the third mediation, McFetridge told Cincinnati, "I think we negotiated the best deal we possibly could given all of the issues in the case," and he recommended Cincinnati fund the settlement. *Id.* at 420. McFetridge noted the nearly $400,000 settlement reflected the mediator-appointed-contractor's recommended damages amount of approximately $374,000, plus $25,000 for repairs already paid by the Woods.[2] Despite McFetridge's recommendation, Cincinnati refused to fully fund the settlement based on its belief that MCI's insurance policy did not cover the damages alleged in the Woods' lawsuit. Cincinnati did increase the settlement authority from $60,000 to $100,000 and stated that if this offer was not accepted, Cincinnati would proceed with a declaratory judgment action in federal district court to determine coverage issues between MCI and Cincinnati. The Woods declined the $100,000 settlement offer, and the parties set an arbitration date for May 29, 2018.

Federal District Court Declaratory Action

Three months before the scheduled arbitration, Cincinnati moved for summary judgment in federal district court, requesting a declaration that Cincinnati "has no obligation to defend or indemnify [MCI] in the Underlying Suit, based upon

---

[2] The mediator-appointed general contractor, Paul Shelton, estimated the cost to repair defects at $562,327.12, but this number was reduced at settlement based on MCI's claim that the Woods owed MCI $200,000.00 for a draw and for unpaid change order work. CP at 419-20.

6

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

two undisputed coverage limitations in Cincinnati's policy." *Id.* at 469. Specifically, Cincinnati argued the "your work" exclusion barred coverage "for damage to [MCI's] own work" and that the Independent Contractors Limitation Endorsement barred coverage "for [MCI's] derivative liability for subcontracted work [in the event MCI failed to verify the subcontractors' liability insurance]." *Id.* The federal district court denied the motion and held Cincinnati had a duty to defend MCI in the underlying suit with the Woods. The court also determined questions of fact precluded summary judgment on Cincinnati's duty to indemnify given that the "underlying suit has not yet concluded." *Id.* at 595.[3]

Additional Liability Estimates and Expert Reports

Following the failed mediations, but before arbitration, McFetridge learned that the Woods had spent around $200,000.00 to repair certain defects. He notified Cincinnati that the Woods could recover as much as $526,102.18 based on the amount they spent on repairs, the calculations of defense expert Buckles, and projected attorney fees. McFetridge indicated the potential net recovery jumped to $1.14 million when based on a portion of plaintiffs' expert Smith's calculations. These higher estimates still did not include any calculation of liability for the

---

[3] As of this writing, the bad faith claim against Cincinnati has yet to be resolved by the federal district court, and issues relating to that claim are not before us.

Woods' extracontractual claims. McFetridge continued to recommend Cincinnati fund the $399,000.00 settlement reached at the third mediation.

In the months leading up to arbitration, the parties conducted additional discovery, including the depositions of Anna Wood and structural engineer Brian Hanson as well as an expert report by plaintiffs' forensic accountant, Kemper Rojas. The report revealed that MCI tried to overcharge the Woods by $302,264.84 and that MCI owed the Woods reimbursement in the amount of $121,497.04. The report also noted that only part of MCI's invoice detail was recorded in its accounting file, with $297,233.00 absent from invoicing and no sales tax recorded or collected on those charges. McFetridge planned to dispute the validity of this report based on the testimony of defense expert Renee Grandinetti at arbitration. McFetridge also filed a motion for partial summary judgment asking the arbitrator to dismiss all of the Woods' claims except for their breach of contract claim. The Woods dispute whether this motion would have been considered. In any case, the motion was never resolved because the parties settled shortly before the scheduled arbitration.

Covenant Judgment Agreement

One week before arbitration, MCI and Milionis's personal counsel, Cunningham, e-mailed McFetridge to notify him a settlement was reached with the Woods, thereby canceling the upcoming arbitration. McFetridge confirmed he was not included in the negotiations that led to that particular settlement. The Woods,

8

MCI, and Milionis formally executed a settlement agreement and covenant not to execute a few weeks later. Specifically, the parties stipulated to a judgment of $1.7 million to the Woods and agreed to release their claims against one another, MCI assigned all of its rights and claims against Cincinnati to the Woods, and the Woods agreed not to collect the stipulated judgment against MCI or Milionis.

PROCEDURAL HISTORY

The parties filed a joint motion in Spokane County Superior Court for entry of the stipulated judgment on June 29, 2018. In support of the motion, the parties included the declaration of plaintiffs' expert Smith who reaffirmed his estimated cost to remedy the defects and complete the project at over $2.7 million. The Woods also filed individual declarations to highlight the emotional distress they both suffered as well as the business losses "of no less than $900,000" Jeffrey Wood incurred from having to take time to deal with the property damage caused "by the actions and omissions by [MCI]." *Id.* at 66-67. The court scheduled a reasonableness hearing under RCW 4.22.060 for July 13, 2018.

Motion To Intervene and Conduct Discovery

Several days before the reasonableness hearing, Cincinnati filed a nonparty motion to intervene. In a supplemental declaration, counsel for Cincinnati noted it did not receive a copy of the settlement agreement between the Woods and MCI until July 6. Cincinnati requested time to conduct discovery related to the proposed

9

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

$1.7 million stipulated judgment and to continue the reasonableness hearing until that discovery concluded. The Woods did not oppose intervention by Cincinnati but argued "a continuance is not warranted . . . and the requested discovery is unnecessary, immaterial and inappropriate." *Id.* at 210. The trial court granted Cincinnati's motion to intervene but denied its request for a continuance and additional discovery, remarking that "[a]ll of the discovery that you're requesting isn't really going to the reasonableness of the settlement." Verbatim Report of Proceedings (VRP) at 47. The trial court also determined that the notice provided was sufficient for purposes of Cincinnati's ability to argue the settlement was not reasonable.

The Reasonableness Hearing

The reasonableness hearing occurred over two days in July 2018. Prior to the second day of the hearing, Cincinnati submitted new pleadings and 14 exhibits to oppose the reasonableness of the settlement. Cincinnati argued the real settlement value of the case was the $399,000 figure reached at the third mediation in October 2017. In reply, the Woods argued their damages exceeded $2 million, noting liability was undisputed, MCI was not judgment proof, and the investigation and preparation of the case was extensive. The Woods moved to strike Cincinnati's filings as untimely and overlength. The trial court denied the motion to strike and considered Cincinnati's pleadings and exhibits.

10

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

During the reasonableness hearing, the court heard testimony from McFetridge, who discussed his representation of MCI and Milionis, his own calculation of damages, and his interactions with Cincinnati. McFetridge confirmed that Cincinnati hired him to represent its insureds and that he did not represent Cincinnati. He remarked that he mainly relied on defense experts Barnes's and Buckles's reports and that his evaluation of the case reflected what he believed "the case possibly could settle for and what [the defense] should consider settling for." *Id.* at 72. Noting that he had previously experienced insurance companies offering less settlement authority than he requested, McFetridge testified such an occurrence was rare. McFetridge confirmed he provided an estimate for a net award of $1.14 million to the Woods based on the plaintiffs' expert reports, noting that estimate was not a "worst case evaluation" but a "potential range of exposure . . . based on what I kn[ew] at the time." *Id.* at 80. McFetridge also explained he filed a motion for partial summary judgment to be considered at arbitration, despite the Woods arguing such motions were not allowed under "triple A" arbitration rules, because he had previously filed similar motions that were at least considered at arbitration.

On the second day of the hearing, Cincinnati asked McFetridge to clarify "how the defense expert came up with a number of $1.2 million for the plaintiffs' damages." *Id.* at 103. Defense expert Barnes estimated the total cost for repairing alleged defects and completing construction at approximately $1.2 million.

11

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

McFetridge remarked he did not account for the latter estimate (the cost to complete construction) based on his own understanding that the home could be finished within the contract price under the contract terms allocating damages for breach. On cross-examination, he conceded that defense expert Buckles "agrees that some responsibility []lies with [MCI]." *Id.* at 112-13. McFetridge also conceded he did not account for consequential or general damages in his supplemental case assessment prior to the third mediation. The trial court asked McFetridge if his recommendation for settlement authority went up between November 2016 and May 2018, and he confirmed his recommendation did eventually go up to $399,000. He clarified that he did not ask for further settlement authority once he knew Cincinnati was not willing to fund even that amount. The trial court asked when McFetridge received the $1.2 million figure from the defense expert, and he stated he did not "recall ever getting a number from [defense expert Barnes] that was $1.2 million" because the numbers from Barnes were just a "general contracting cost estimator to prove what [Barnes] would . . . do the project for." *Id.* at 121.

At the end of the hearing, the trial court observed:

> When you look at . . . Mr. Milionis and the liability to the corporation and the officers of the corporation and the damages, I look at it in October, but since [the] October [mediation], [the parties] did a lot more negotiations. They did depositions. You got experts involved on the defense side, too, that gave a lot higher numbers than the $399,000 that happened in October.

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

*Id.* at 141. The trial court considered the facts in light of the applicable *Chaussee* factors[4] and determined the $1.7 million settlement was reasonable; the court granted the motion to enter the stipulated judgment.

Court of Appeals Decision and Subsequent Procedural History

In a 2-1 unpublished opinion, the Court of Appeals reversed the trial court's reasonableness determination based on what it described as a "significant discrepancy" between the defense evaluation of damages at under $350,000 and the trial court's belief that certain defense experts valued the case at $1.2 million. *Wood*, slip op. at 1-2. The dissenting judge criticized the majority for misunderstanding the various evaluations and substituting its own judgment for the trial court's. *Id.* dissent at 27 (Fearing J., dissenting). The Woods petitioned this court for review, which we granted. *Wood v. Cincinnati Specialty Underwriters Ins. Co.*, 196 Wn.2d 1017, 474 P.3d 1053 (2020). We accepted an amici brief from the American Property Casualty

---

[4] The *Chaussee* factors originate from the Court of Appeals case *Chaussee v. Maryland Casualty Co.*, 60 Wn. App. 504, 803 P.2d 1339 (1991). Courts apply the factors in determining whether a settlement with a covenant not to execute is reasonable. The factors include (1) the releasing person's damages, (2) the merits of the releasing person's liability theory, (3) the merits of the released person's defense theory, (4) the released person's relative faults, (5) the risks and expenses of continued litigation, (6) the released person's ability to pay, (7) any evidence of bad faith, collusion, or fraud, (8) the extent of the releasing person's investigation and preparation of the case, and (9) the interests of the parties not being released. *Id.* at 511-12. Application of the *Chaussee* factors is discussed in the analysis below.

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

Insurance Association and the National Association of Mutual Insurance Companies (APCIA et al.).

ANALYSIS

Appellate courts review a trial court's determination that a settlement is reasonable for an abuse of discretion. *Bird*, 175 Wn.2d at 774. An abuse of discretion occurs where "the 'decision is manifestly unreasonable or is based on untenable grounds or untenable reasons.'" *Id.* at 774-75 (quoting *Water's Edge Homeowners Ass'n v. Water's Edge Assocs.*, 152 Wn. App. 572, 584, 216 P.3d 1110 (2009)). A "reviewing court may not find abuse of discretion simply because it would have decided the case differently—it must be convinced that '*no reasonable person* would take the view adopted by the trial court.'" *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, 190 Wn.2d 483, 494, 415 P.3d 212 (2018) (internal quotation marks omitted) (quoting *State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017)) (internal citations omitted)). Here, the trial court did not abuse its discretion; it properly applied the appropriate criteria to determine the settlement reached was reasonable. The Court of Appeals departed from the deferential standard of review when it reversed the trial court's well-supported decision based on its own mistaken assessment of the damages in this case. We therefore reverse the Court of Appeals and reinstate the trial court's order.

14

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

We also reverse the Court of Appeals "suggestion" that the trial court should, on remand, grant Cincinnati's request for additional discovery. Absent any finding of error, this directive was unwarranted. The trial court acted within its discretion in denying Cincinnati's motion for a continuance and additional discovery.

I.      Background on Covenant Judgments and Reasonableness Hearings under RCW 4.22.060

This court has long recognized the ability of an insured defendant facing claims by a plaintiff to independently negotiate a settlement where the insurer declines to settle. *Evans v. Cont'l Cas. Co.*, 40 Wn.2d 614, 627-28, 245 P.2d 470 (1952). Typically, this process involves the insured defendant entering into a settlement agreement with the plaintiff in exchange for a covenant not to execute the judgment against it and assignment of potential bad faith claims against its insurer. *Besel v. Viking Ins. Co. of Wisc.* 146 Wn.2d 730, 736, 49 P.3d 887 (2002); *see also Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 398-400, 823 P.2d 499 (1992). Because a covenant judgment presents the potential for fraud or collusion between the settling parties, the settlement is subject to a reasonableness hearing in superior court pursuant to RCW 4.22.060(1). *Besel*, 146 Wn.2d at 738-39.

RCW 4.22.060 was enacted as part of the tort reform act of 1981, mainly "to provide a means to allocate liability among joint tortfeasors." *Bird*, 175 Wn.2d at 766. A reasonableness hearing "under RCW 4.22.060 is an equitable proceeding to

15

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

which no jury trial right is afforded." *Id.* at 773. We have recognized nine non-exclusive factors to help guide courts in determining whether a settlement is reasonable:

> "[T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released."

*Glover v. Tacoma Gen. Hosp.*, 98 Wn.2d 708, 717, 658 P.2d 1230 (1983) (alteration in original) (quoting brief), *abrogated on other grounds by Crown Controls v. Smiley*, 110 Wn.2d 695, 756 P.2d 717 (1988).

While courts refer to these as the "*Glover* factors" in the joint and several liability context, they are known as the "*Chaussee* factors" in the covenant judgment context—in reference to the Court of Appeals case that first applied them in this setting: *Chaussee v. Maryland Casualty Co.*, 60 Wn. App. 504, 803 P.2d 1339 (1991); *see also Bird*, 175 Wn.2d at 767 (noting this court implicitly adopted the *Chaussee* factors in *Besel*, 146 Wn.2d at 738-39, and *Mutual of Enumclaw Insurance Co. v. T&G Construction, Inc.*, 165 Wn.2d 255, 264, 199 P.3d 376 (2008), and expressly adopting application of the *Chaussee* factors and RCW 4.22.060 to reasonableness hearings involving covenant judgments).

16

At a hearing under RCW 4.22.060(1), "[t]he settling parties have the burden to prove reasonableness" under the relevant factors. *Bird*, 175 Wn.2d at 766. If the trial court finds a settlement reasonable, the settlement amount becomes "the presumptive measure of an insured's harm caused by an insurer's tortious bad faith." *Besel*, 146 Wn.2d at 738. Further, once a settlement is found reasonable at the covenant judgment stage, the burden shifts to the insurer to prove the settlement resulted from fraud or collusion in the subsequent bad faith action against the insurer. *Id.* at 739.

A trial court exercises discretion in applying the *Chaussee* factors, and "[a]ll nine criteria will not necessarily be relevant in every case." *Id.* at 739 n.2. Reasonableness is a fact-specific inquiry. For example, the Court of Appeals upheld a trial court's determination that a $17.4 million covenant judgment was reasonable "[g]iven the extent of [the plaintiff's] injuries, [the defendant's] clear liability, [the defendant's] financial situation, and the anticipated costs of future litigation." *Howard v. Royal Specialty Underwriting, Inc.*, 121 Wn. App. 372, 383, 89 P.3d 265 (2004). In contrast, a covenant judgment for $8.75 million was deemed unreasonable where the insurance-appointed defense counsel "had already successfully removed the [plaintiff's] warranty claims . . . on summary judgment and anticipated success in defending against most of the [plaintiff's] remaining claims." *Water's Edge*, 152 Wn. App. at 599. The unreasonableness of the covenant

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

judgment in *Water's Edge* was also influenced by the fact that the insurance-appointed defense counsel predicted a "worst case scenario" judgment for the plaintiff between "$250,000 and $350,000." *Id.* at 588. Appellate review of a trial court's reasonableness determination reflects deference to the trial court's ability to consider all relevant facts, make credibility determinations, and evaluate competing damages assessments, while being alert to indicia of fraud, bad faith, or collusion. *See Chaussee*, 60 Wn. App. at 512; *Bird*, 175 Wn.2d at 766. With this background in mind, we examine whether the trial court correctly ruled that the covenant judgment entered here was reasonable.

II.     Substantial Evidence Supports the Trial Court's Reasonableness Determination

Appellate courts will not disturb a trial court's factual finding that a settlement is reasonable "when supported by substantial evidence." *Brewer v. Fibreboard Corp.*, 127 Wn.2d 512, 524, 901 P.2d 297 (1995) (plurality opinion). Here, substantial evidence supports the trial court's determination that the $1.7 million covenant judgment was reasonable.[5]

---

[5] Cincinnati failed to assign error to several trial court findings supporting the reasonableness determination, and the Court of Appeals properly regarded the findings as verities on appeal. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002). Like the Court of Appeals, we accept as true that (1) the Woods demonstrated MCI breached tort and contract duties owed to the Woods and that MCI proximately caused injuries to the Woods, (2) the Woods demonstrated negligent actions and omissions by MCI proximately caused the Woods to suffer anxiety and emotional distress, and (3) the Woods demonstrated MCI violated the CPA, chapter 19.86 RCW. *See Wood*, slip op. at 17

18

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

We consider the trial court's determination in light of the relevant *Chausee* factors. Though the court's decision did not directly cite each of the *Chaussee* factors, this is not required, as a trial court's reasonableness determination is sufficiently clear when "'the parties addressed the factors in their briefs and the trial court considered the briefs.'" *Hidalgo v. Barker*, 176 Wn. App. 527, 549, 309 P.3d 687 (2013) (quoting *Water's Edge*, 152 Wn. App. at 585). Both the Woods and Cincinnati addressed the *Chaussee* factors in their briefs. *See* CP at 608-611 (wherein the Woods argue that their expert's testimony supported damages of over $2 million, that MCI had no defense against consequential and general damages, and that the Woods "committed significant resources and effort to investigation and preparation of their case"); *see also id.* at 445-55 (wherein Cincinnati argues that MCI was potentially "judgment proof," that the settlement number was "artificially inflated," and that some of the Woods' claims likely would have been dismissed on summary judgment).

At the reasonableness hearing, the trial court analyzed the applicability of the relevant *Chaussee* factors in its oral remarks. The key disputed factors went to

---

(quoting CP at 650-51). We observe, however, that accepting these unchallenged findings as verities on appeal does not preclude Cincinnati's challenge to the reasonableness of the $1.7 million settlement amount, recognizing that reasonableness is the ultimate question and Cincinnati's challenge was "abundantly clear." *Id.* at 18 n.8 (citing *Spokane Sch. Dist. No. 81 v. Spokane Educ. Ass'n*, 182 Wn. App. 291, 299 n.2, 331 P.3d 60 (2014)).

19

damages, liability and defenses to liability, the defendants' ability to pay, and evidence of bad faith, fraud, or collusion. The trial court properly addressed each of these, as well as the remaining factors, to support its ruling.[6]

A. Releasing Person's Damages

The trial court evaluated the competing estimates of the Woods' damages at the reasonableness hearing. The court noted that the $399,000 settlement in October served as a starting point but remarked that "since October, [the parties] did a lot more negotiations . . . [and] depositions" and that certain defense experts had placed damages above $399,000. VRP at 141. Defense expert Barnes estimated the cost to repair deficiencies at $540,000 and the cost to complete the project at $674,000. McFetridge acknowledged he omitted this latter figure from his estimated range of MCI's exposure based on his assumption that "the project could be completed as originally contracted within the amount remaining on the contract." *Id.* at 102. However, whether the Woods were entitled to an award of damages based on the cost to complete the project remained a key issue to be decided at arbitration. McFetridge also admitted he did not account for the possibility of any consequential or general tort damages or statutory damages. Prior to the third mediation,

---

[6] On appeal, Cincinnati argues the trial court erred by assigning to it the burden of proving the settlement was unreasonable. We agree with the Court of Appeals that the trial court properly understood that the settling parties, not Cincinnati, had the burden to prove reasonableness. *Wood*, slip op. at 16-17.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

McFetridge's calculations accounted only for the portion of defects for which MCI assumed 65 percent liability and attorney fees of $180,000.

Unlike defense expert Barnes's estimated total, the Woods' expert estimated total damages of $2.7 million to remedy defects and complete construction. Even after subtracting the estimated $800,000 remaining on the contract (based on McFetridge's calculations), the plaintiffs' expert testimony supported a damages award of just under $2 million for the breach of contract claim, without regard to consequential or tort damages, or treble damages under the CPA. Following more discovery, the Woods' financial expert estimated that MCI owed the Woods $121,000 in reimbursement for overcharges and also noted that over $297,000 in charges "were absent from the invoice detail." CP at 339-40.

The trial court weighed varied and competing expert testimony that valued the damages from around $150,000 to $2,700,000 for the breach of contract claim alone. The trial court also recognized the Woods had potential tort and CPA claims and thus reasoned that a judgment for the Woods "could have exceeded well over a million dollars." VRP at 142. What weight to give the competing estimates of the value of the Woods' claims was a matter within the trial court's discretion.

In concluding the trial court abused its discretion, the Court of Appeals majority misapprehended parts of the record and improperly gave greater weight to certain defense expert testimony. The majority stated that "[t]he basis for the trial

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

court's determination was its belief that [MCI], itself, had valued the [Woods']

contract damages at $1.2 million" when, in reality, MCI "valued the [Woods']

contract damages at less than $350,000, which includes $200,000 for what the

[Woods] asserted they previously paid for repairs." *Wood*, slip op. at 1 (emphasis

omitted). This statement is inaccurate for three reasons.

First, the trial court's determination of reasonableness stemmed from its

thorough application of most of the nine *Chaussee* factors, not simply reliance on a

defense expert's calculation of $1.2 million. Second, the majority is mistaken in

assuming the defense expert's calculation of $350,000 included $200,000 for

previously paid repairs and that this estimate never increased. McFetridge first

asked for the $350,000 in settlement authority based on the most conservative

estimate by defense expert Buckles and on McFetridge's own calculation of

$180,000 in attorney fees. He later requested settlement authority to approve the

$399,000 settlement after learning about the $200,000 the Woods had to pay for

repairs. By March 2018, McFetridge estimated that a conservative award of

damages to the Woods totaled approximately $526,000, based on defense expert

testimony, and thus he encouraged Cincinnati to fund the tentative settlement of

$399,000.

Third, the majority wrongly believed the trial court erred in attributing the

$1.2 million figure to a defense expert. *Id.* at 12 n.6. This issue appeared to most

22

influence the majority's decision to reverse, so it deserves a closer look. At the reasonableness hearing, defense expert Barnes estimated the cost to remedy defects at $540,341.76 and the cost to complete the project at $674,292.19; this totals approximately $1.2 million in damages, as the trial court recognized. McFetridge acknowledged he did not account for the second figure when requesting settlement authority because he believed that the fact the Woods had not paid about $800,000.00 of the contract price meant they would not be entitled to any damages for the cost to complete the house. But the types of damages to which the Woods were entitled remained an issue to be decided at arbitration. McFetridge noted the terms of the contract stated the Woods would be entitled to damages for the cost to complete the project if those damages exceeded the amount remaining on the contract.

In measuring damages in contract construction cases, courts in Washington follow *Restatement (Second) of Contracts* § 348 (Am. Law Inst. 1981), which recognizes the injured party is entitled to "'the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value.'" *Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 47, 686 P.2d 465 (1984) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 348, at 119-20). Consistent with this approach, in *Eastlake*, we affirmed the trial court's calculation of damages for the cost to complete the project *and* damages for the cost

of repairing nonconforming work performed by the defendant. *Id.* at 32, 35. We also noted the trial court there had offset the amount owing on the construction contract from the total award. *Id.* at 36-37.

Applying the *Restatement* approach, the trial court here fairly considered the defense expert's total evaluation of $1.2 million. McFetridge's estimation that $800,000 remained on the contract could have lessened this figure, but McFetridge also did not calculate for loss of use damages, which are allowed under *Eastlake*. *See id.* at 35 (allowing damages for the loss of reasonable rental value). Taking into account the plaintiffs' expert evaluation of $2.7 million and assuming an $800,000 offset, the Woods would still be entitled to $1.9 million for their breach of contract claim alone. The Woods also sought additional damages, including $121,497 in overpayments, $297,233 "for which sales tax was likely owed," CPA damages (treble damages), and attorney fees. Pet'r's Suppl. Br. at 8. The trial court reviewed all the evidence and took these other damages and costs into consideration in reaching its reasonableness determination.

The Woods and the dissenting judge below persuasively argue that the Court of Appeals majority "considered only the Defense side of the equation" and improperly reweighed the evidence by relying on the most conservative damage estimates from defense expert Buckles. Pet'r's Suppl. Br. at 4; *Wood*, slip op. dissent at 32 (Fearing, J., dissenting). The majority appeared to reverse the trial court based

24

on a discrepancy it observed between the $350,000.00 damages figure it attributed to defense expert testimony and the $1.2 million figure discussed by the trial court. *Wood*, slip op. at 1-2. This overlooks the fact that McFetridge's initial request for $350,000.00 in October 2017 did not account for the higher-end evaluations by defense expert Barnes and mediator-appointed-expert Shelton to remedy the alleged defects. It also assumes defense expert Buckles's opinion would prevail over all other expert reports. *See* CP at 360, 453 (Barnes estimates cost to remedy defects at over $540,000.00); *see also id.* at 419 (mediator-appointed-expert Shelton estimates cost to remedy defects at over $562,327.12). The majority's reliance on damages of $350,000.00 also does not tell the whole story, given the increasing costs and damages calculated in the following months. And McFetridge conceded he did not ask for settlement authority beyond $399,000.00 because he realized Cincinnati would not fund even that amount. Finally, the majority fails to account at all for the extracontractual damages and attorney fees.

To conclude the trial court abused its discretion, the reviewing court must find no reasonable person would agree with the trial court's decision. *Gilmore*, 190 Wn.2d at 494. That cannot be said here. The Court of Appeals majority failed to afford deference to the lower court's reasonableness determination when it relied on its own improper, and at times inaccurate, assessment of the damages for the Woods' breach of contract claim and disregarded damages for the Woods' other claims.

25

Substantial evidence supports the trial court's determination of damages. In reversing, the Court of Appeals majority based its reasoning almost exclusively on its disagreement with the trial court's damages assessment. We reject the Court of Appeals analysis in that regard and review the trial court's application of the remaining *Chaussee* factors for an abuse of discretion.

### B. Merits of Liability Theory and Defenses

The second and third *Chaussee* factors examine reasonableness in light of the merits of the plaintiff's liability theory and the potential defenses to liability. No party disputes MCI's liability for the construction defects in the Woods' home. The trial court commented that the Woods' damages stood out "quite a bit," "especially with the defense conceding that there was liability on the defendant's part." VRP at 142, 141. The Woods also presented compelling arguments for relief against Milionis in his personal capacity based on Milionis's fraudulent conduct, misrepresentation, and commingling of MCI's funds with his own personal affairs. As for defenses, MCI had moved to dismiss the bulk of the Woods' claims on summary judgment at arbitration. McFetridge noted he had brought similar motions in the past that were considered at arbitration and he believed his current motion was meritorious. Yet, McFetridge did not specify that any of those past motions were granted, and the trial court was well within its discretion to express uncertainty on whether the present motion would have succeeded.

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

The mere potential that McFetridge's summary judgment motion may have led to the dismissal of some of the Woods' claims stands in contrast to the situation in *Water's Edge*. There, the trial court's prior ruling granting partial summary judgment to dismiss the plaintiff's warranty claims "effectively 'gutted' the [plaintiff's] case." 152 Wn. App. at 587. Here, the Woods appear to have a strong case for liability on multiple theories and the defenses to liability were unresolved at the time of settlement. Accordingly, the trial court did not abuse its discretion in assessing liability and defenses to liability.

C. The Released Person's Ability To Pay

When a defendant, "[b]y virtue of [a] bankruptcy discharge," has a "complete defense to personal liability," courts recognize "the reasonableness of a settlement . . . is open to question because the insured will have no incentive to minimize the [settlement] amount." *Werlinger v. Warner*, 126 Wn. App. 342, 351, 109 P.3d 22 (2005) (citing *Besel*, 146 Wn.2d at 737-38). The trial court here remarked that a "$2 million judgment . . . would probably push [Milionis] into bankruptcy if he doesn't have enough assets to cover that," but it found this factor was not dispositive. VRP at 143. In part this is because the Woods pointed out that a successful suit against Milionis in his personal capacity "would have included attaching and enforcing liens against personal and real property and garnishing bank accounts and any contract proceeds from other projects or wages." CP at 611. The trial court concluded that

27

Milionis "could end up in bankruptcy, but at this point, I only have that he hasn't filed bankruptcy, and there still would be assets at this time." VRP at 143. There was no evidence in the record suggesting Milionis or MCI were judgment proof, and the trial court did not abuse its discretion in analyzing the defendants' ability to pay.

D. Evidence of Bad Faith, Fraud, or Collusion

This court recognizes that "a covenant not to execute raises the specter of collusive or fraudulent settlements" and, to that end, the *Chaussee* analysis "promotes reasonable settlements and discourages fraud and collusion." *Besel*, 146 Wn.2d at 738. In *Water's Edge*, the trial court determined a covenant judgment was unreasonable based on several troubling circumstances: (1) counsel for the plaintiff contacted the defendants without notice to the insurance-appointed defense counsel and recommended the defendants obtain independent counsel, (2) the parties "realigned their interests by stipulating that [the defendants] could recover their $215,000 contribution if the [plaintiff] prevailed in its malpractice and bad faith case [against the insurer], and (3) neither of the defendants "had any reason to care what dollar amount they agreed to, so long as they could sell it to the trial court as reasonable." 152 Wn. App. at 595-96.

One of Cincinnati's main arguments against the reasonableness of the covenant judgment was that "a lack of serious negotiation [on behalf of the parties] suggests that there was bad faith." VRP at 137. Cincinnati also raised alarm that

the parties' initial settlement for $399,000 increased to $1.7 million and that McFetridge was not included in the parties' final settlement discussions. The trial court expressed concern that McFetridge was "involved in the three prior mediations and then they get to this new one and he's cut out of that." *Id.* at 143. Even so, the court noted this fact was less troubling given that damages already appeared to exceed $500,000 and, yet, Cincinnati was still not forthcoming with the settlement authority McFetridge requested.

Over the course of three mediations, Cincinnati never raised McFetridge's settlement authority above $100,000, despite his request for settlement authority of $399,000. McFetridge admitted he never asked for any higher settlement authority once he realized Cincinnati was unwilling to fully fund the $399,000 settlement tentatively reached at the third mediation. This prompted the trial court to ask Cincinnati's counsel, "What good would it be to have [McFetridge] at those [later] negotiation tables then if he has no authority to settle anything?" *Id.* at 138. Cincinnati also failed to present evidence of communications or other circumstances to suggest collusion between the Woods and MCI. Unlike in *Water's Edge*, nothing in this record indicates any collusion or bad faith between the Woods' counsel and MCI's personal counsel. Instead, the parties pursued settlement negotiations for almost two years, while damages and attorney fees continued to mount, before ultimately turning to the covenant judgment option. Given all the facts before the

trial court, the court did not abuse its discretion in determining there was no evidence of fraud or collusion to suggest the settlement reached was unreasonable.

### E.  Remaining *Chaussee* Factors

While the above factors are most significant in this case, no single *Chaussee* factor controls a trial court's reasonableness determination and not every factor will apply in a particular case.  *Besel*, 146 Wn.2d at 739 n.2.  Here, the trial court discussed other *Chaussee* factors to support its decision that the $1.7 million settlement was reasonable.  First, the trial court noted that "the risks and expenses of continued litigation" were considerable given "the amount of money [the Woods] have expended to bring in a forensic expert, to bring in the depositions and expenses of that litigation, as well as . . . prepping for time."  VRP at 142.  Second, the court noted that "there was extensive investigation and preparation" by the defendants based on expert testimony, briefs filed for arbitration, and three separate mediations. *Id.* at 144.  Insurance-retained-counsel McFetridge was involved throughout the mediations and in the months leading up to arbitration.  Lastly, the court accounted for Cincinnati's interest as the insurer to the party being released.  The trial court granted Cincinnati's request to intervene so it could participate in the reasonableness hearing.  And before the second day of the reasonableness hearing, the trial court allowed Cincinnati to submit additional pleadings and exhibits and considered Cincinnati's arguments in reaching its ruling.

30

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

Considering everything in the record, substantial evidence supports the trial court's determination that the $1.7 million covenant judgment is reasonable. The Woods presented evidence that their damages could well exceed $2 million. Beyond the contract damages, the Woods claimed significant consequential and tort damages. If they prevailed on their CPA claim, the Woods would also be entitled to treble damages. The defendants did not dispute they were at least partially liable and, prior to the final settlement, none of the Woods' claims had been dismissed on summary judgment. Neither Milionis nor MCI had filed for bankruptcy. And the settlement was ultimately reached after years of failed negotiations, while damages and costs continued to rise. Based on all of the evidence, we hold the trial court was well within its discretion to find the $1.7 million settlement reasonable. The Court of Appeals majority failed to apply the appropriately deferential standard of review and instead improperly reassessed and reweighed some of the evidence. We therefore reverse the Court of Appeals and reinstate the trial court's order.

We conclude by addressing the argument of amici APCIA et al., which criticizes the trial court for denying Cincinnati's continuance and discovery requests and argues for a bright line rule allowing insurers to conduct additional discovery before reasonableness hearings. Br. of Amici Curiae APCIA et al. at 11-17.

31

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

III.    The Trial Court Did Not Abuse Its Discretion in Denying Cincinnati's Request for a Continuance and Additional Discovery

Whether to allow continuances and to limit discovery are discretionary decisions—here, the trial court did not abuse its discretion when denying Cincinnati's requests for a continuance and additional discovery. Amici argue covenant judgments "inherently carry with them the risk of collusion and fraud" and, therefore, urge us to establish a bright line rule that "those insurers against whom the covenant judgment will be used should always be entitled to discover the communications surrounding the settlement negotiations between the insured's lawyer and the plaintiff's lawyer." *Id.* at 12. This rule would unwisely eliminate the discretion of trial courts to address the circumstances in each case when ruling on motions for a continuance or discovery.

Typically, "[w]e review a trial court's denial of a continuance for abuse of discretion." *Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co.*, 124 Wn.2d 789, 813, 881 P.2d 1020 (1994). We apply the same abuse of discretion standard to a trial court's decision to permit or deny discovery. *T.S. v. Boy Scouts of Am.,* 157 Wn.2d 416, 423, 138 P.3d 1053 (2006); *Howard*, 121 Wn. App. at 379. A trial court's discovery order is reversible only if the order is manifestly unreasonable or exercised on untenable grounds or reasons. *T.S.*, 157 Wn.2d at 423.

32

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

In the context of reasonableness hearings, trial courts may grant an insurer's motion for additional discovery or a continuance. *See, e.g., Bird*, 175 Wn.2d at 763 (granting insurer's motion for discovery and a continuance); *see also Water's Edge*, 152 Wn. App. at 582 (granting insurer's motion to intervene and conduct limited discovery). At the same time, trial courts may also reasonably deny such motions. *See, e.g., Red Oaks Condo. Owners Ass'n v. Sundquist Holdings, Inc.*, 128 Wn. App. 317, 321, 116 P.3d 404 (2005) (holding six days' notice afforded sufficient time to prepare for the reasonableness hearing);[7] *see also Howard*, 121 Wn. App. at 379 (denying an insurer's request to reopen discovery because the insurer "was not a complete stranger to the case" and "had the opportunity to participate in [prior] discovery" (internal quotation marks omitted)).

Here, Cincinnati received notice of the parties' settlement one week before the reasonableness hearing. Following this notice, the trial court granted Cincinnati's motion to intervene but denied its motions for additional discovery and a continuance. In denying the latter motions, the trial court reasoned there was "enough in discovery for Cincinnati to give the Court an idea of why" the settlement

---

[7] The Court of Appeals in *Red Oaks* considered the argument for a de novo standard of review where the appellant claimed "a violation of its right to constitutional due process," but the court concluded that "[u]nder either standard . . . [the appellant] was afforded sufficient notice and time to prepare [for the reasonableness hearing for a covenant judgment]." 128 Wn. App. at 321.

33

was not reasonable. VRP at 47-48. Moreover, the trial court accurately noted that the purpose of discovery is to aid its reasonableness determination and that the discovery Cincinnati was requesting did not appear to relate "to the reasonableness of the settlement" so much as it related to potential "collusion against Cincinnati." *Id.* at 47. Following these rulings, the trial court heard Cincinnati's arguments against the reasonableness of the covenant judgment. Due to time constraints on the day the hearing was first set, Cincinnati received a de facto continuance, and the trial court considered its additional pleadings and exhibits offered one day before the resumed hearing.

We find the situation here closely aligns with *Red Oaks* and *Howard* for purpose of continuance and discovery motions. Similar to the insurer in *Red Oaks*, Cincinnati received sufficient notice and time to prepare for the reasonableness hearing. And, like the insurer in *Howard*, Cincinnati was not a stranger to the case and had been heavily involved in multiple settlement discussions in the months just before the scheduled arbitration. Thus, the trial court acted within its discretion in denying Cincinnati's request for a continuance and additional discovery. We reject the contrary rule proposed by amici.

## CONCLUSION

We reverse the Court of Appeals and hold the trial court did not abuse its discretion in finding the covenant judgment reasonable. The trial court considered

34

*Wood v. Milionis Constr., Inc. et al.*, No. 98791-2

the relevant *Chaussee* factors and its reasonableness determination is supported by substantial evidence. The Court of Appeals majority erroneously reweighed the evidence and substituted its own judgment for the trial court's, contrary to the deferential standard of review that applies. Lastly, we find no reversible error in the trial court's discretionary decision to deny Cincinnati's request for a continuance and additional discovery.

_____
Stephens, J.

WE CONCUR:

_____    _____
González, C.J.                                Gordon McCloud, J.

_____    _____
Johnson, J.                                     Yu, J.

_____    _____
Madsen, J.                                    Montoya-Lewis, J.

_____    _____
Owens, J.                                       Whitener, J.